IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) Case No. 16 cv 6224 ) |
| v. | ) **Jury Demand** ) |
| CHICAGO MERCANTILE EXCHANGE INC., and CME GROUP INC., | ) ) ) |
| Defendants. | ) |

**COMPLAINT**

Plaintiff MICHAEL WALSH, individually and on behalf of all other plaintiffs similarly situated, by and through his attorney, and for his Complaint against CHICAGO MERCANTILE EXCHANGE INC., and CME GROUP INC. (collectively "Defendants"), states as follows:

**NATURE OF THE CLAIMS**

1. Employers must include shift differential pay when determining an employee's regular rate of pay.

2. This lawsuit arises under the Fair Labor Standards Acts, 29 U.S.C. §201, *et seq.* ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/2 *et seq.* for Defendants' failure and refusal to pay Plaintiff his earned shift differential pays and the full amount of Plaintiff's overtime wages and other contractually mandated wages due to Defendants' failure to include shift differential pay in the "regular rate of pay."

**JURISDICTION AND VENUE**

3. This Court has jurisdiction over Plaintiff's FLSA claim pursuant to 28 U.S.C. §1331 arising under 29 U.S.C. §206(b). The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

4. Venue is proper pursuant to 28 U.S.C. §1391(b), where Defendants have offices, conduct business, and can be found in this District, and a substantial part, if not all, of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

5. Plaintiff MICHAEL WALSH is, and was at all relevant times, a resident and citizen of Illinois and in this judicial district.

6. Plaintiff was an employee of Defendants at all relevant times.

7. During the course of his employment, Plaintiff performed non-exempt work for Defendants.

8. Defendant CHICAGO MERCANTILE EXCHANGE INC. (hereinafter "CME") is a Delaware corporation and it operates a stock exchange in Chicago, which provides futures contracts and options on futures for its financial products such as interest rates, stock indexes, foreign exchange, and commodities and it also provides electronic trading floor and an electronic trading platform.

9. CME was founded in 1898 and is based in Chicago, Illinois.

10. CME is registered to do business in Illinois with its registered agent in Chicago and does business within this judicial district.

11. CME is an "enterprise" and an "enterprise engaged in commerce or in the production of goods for commerce" as defined by sections 3(r)(1) and 3(s)(1)(A) of the FLSA, 29 U.S.C. §§ 203(r)(1) and (s)(1)(A).

12. CME was the Plaintiff's "employer" as defined in section 3(d) of the FLSA, 29 U.S.C. § 203(d), section 3(c) of the IMWL, 820 ILCS 105/3(c), and section 2 of the IWPCA, 820 ILCS 115/2.

13. CME operates as a wholly owned subsidiary of Defendant CME GROUP INC. (hereinafter "CME GROUP").

14. CME GROUP is registered to do business in Illinois with its registered agent in Chicago, does business within this judicial district and has its principal executive offices in Chicago.

15. CME GROUP is an "enterprise" and an "enterprise engaged in commerce or in the production of goods for commerce" as defined by sections 3(r)(1) and 3(s)(1)(A) of the FLSA, 29 U.S.C. §§ 203(r)(1) and (s)(1)(A).

16. CME GROUP was the Plaintiff's "employer" as defined in section 3(d) of the FLSA, 29 U.S.C. § 203(d), section 3(c) of the IMWL, 820 ILCS 105/3(c), and section 2 of the IWPCA, 820 ILCS 115/2.

## FACTUAL ALLEGATIONS

17. Plaintiff was hired by Defendants on or around January 10, 2011 as a "Supervisor Building Operations" at the Data Center and Critical Infrastructure Department of CME.

18. The offer letter addressed to the Plaintiff written on CME GROUP letter head provided that the Plaintiff was offered an employment with CME, a wholly owned subsidiary of

CME GROUP, at "a starting pay of $34.00 hourly" and additional bonuses if applicable, suggesting that the Plaintiff would receive all wages that he would earn.

19. The "Supervisor Building Operations" position was an entry level position and did not involve supervising of any employees.

20. Plaintiff was to report to Associate Directors Wayne Bearden and Mike Briskey.

21. The Managing Director of the Data Center and Critical Infrastructure Department was Senior Director Robert Petrowski (hereinafter "Managing Director Petrowski"), who also oversaw managing directors of other departments as a senior director, including the IT Department.

22. All of the pay adjustments, title change, location change and pay raises for the Plaintiff and other employees at the department required Managing Director Petrowski's approval.

23. During the course of his employment with Defendants, the Plaintiff was not promoted to a next level but received pay raises on 5 occasions upon Managing Director Petrowski's approval.

24. The purpose of the "Supervisor Building Operations" position was to supervise the day-to-day operations and maintenance of a "Critical Environment" associated with a high reliability of Data Center and other Critical Infrastructure.

25. The "Supervisor Building Operations" position required "24x7x365 On-Call" duties and a certain number of employees had to constantly monitor and respond to relevant Data Center Alarms and resolve problems with receiving unscheduled deliveries for other departments at the Data Center Facility.

26. The employment of the Plaintiff and all other employees at the department terminated as of March 31, 2016 due to a sale of the company.

*Shift Differential*

27. On or around January 20, 2011, the Plaintiff received his first paycheck along with an earnings statement from Defendants.

28. On the earnings statement for the Plaintiff's January 20, 2011 pay, the Plaintiff's wages, both regular and overtime, were calculated based on an hourly rate 10% higher than the Plaintiff's starting hourly rate.

29.  After the Plaintiff received his first paycheck and when he was looking at his payroll on his computer screen, one of his co-workers walked by and said "What? You're getting a shift differential? You'd better not be getting it because then they owe me a lot."

30. At that time, the Plaintiff and his co-worker were working the second shift, an afternoon shift starting at 1:00 pm and ending at 9:00 pm.

31. The next day, the Plaintiff asked Managing Director Petrowski about his shift differential pay. Managing Director Petrowski told the Plaintiff "There is a shift differential."

32. On or around February 3, 2011, the Plaintiff received another earnings statement.

33. However, on the earnings statement for the Plaintiff's February 3, 2011 pay, the Plaintiff's wages, both regular and overtime, were calculated based on the Plaintiff's starting hourly rate.

34. At that time, the Plaintiff was still working the same second shift, the afternoon shift from 1:00 pm through 9:00 pm.

35. Plaintiff asked Associate Directors Wayne Bearden and Mike Briskey. Both of them told the Plaintiff not to raise that issue again.

36. Sometime later in the summer, the Plaintiff had a conversation with a manager of the IT Department at the same facility. During the conversation, the IT Department manager

5

said he gets "paranoid about the guys changing shifts" and having to approve shift differentials accordingly and he was surprised to discover that the employees at the Data Center and Critical Infrastructure Department were not receiving shift differentials. The IT Department manager said Managing Director Petrowski was "trying to make his budget look better."

37. Plaintiff became aware that Defendants implemented a shift differential policy to compensate their employees who were required to work a shift covering night hours and Saturdays and Sundays, like the Plaintiff and his co-workers.

38. Per the policy, employees working those shifts would receive their pays based on a rate 10% higher than their base hourly rate.

39. At the Data Center and Critical Infrastructure Department, only one shift was assigned to Saturdays and Sundays, whereas two or three shifts were assigned to other days of the week.

40. Before around July 31, 2011, the Data Center and Critical Infrastructure Department did not require a 24 hour per day coverage but the "24x7x365 On-Call" duties commenced around July 31, 2011.

41. At the Data Center and Critical Infrastructure Department, the second Shift from 1:00 pm to 9:00 pm before July 31, 2011 and the second and third shifts from 3:00 pm to 11:30 pm and from 11:00 pm to 7:30 am since July 31, 2011 were eligible for shift differential. Also, Shift B from Tuesday to Saturday and Shift C from Sunday to Thursday were eligible for shift differential. Other shifts, i.e., the first shift from 5:00 am to 1:00 pm before July 31, 2011 and the first shift from 7:00 am to 3:30 pm since July 31, 2011 and also Shift A from Monday to Friday were not eligible for shift differential.

42. Since around July 31, 2011, the employees at the Data Center and Critical Infrastructure Department were required to work night shifts and weekend shifts due to the Department's needs for a continual "24x7x365" coverage.

43. Plaintiff realized that whereas his schedules would indicate which shift he was assigned to, his payroll would always indicate that he worked the first shift, which was ineligible for shift differential.

44. Plaintiff did not volunteer to work night shifts and weekend shifts and Plaintiff never agreed to receive a wage that was less than the actual wage that he earned.

45. Shift differential pays were not bonuses but part of plaintiff's regular wage.

46. Managing Director Petrowski, who also oversaw other managing directors as a Senior Director, withheld approval of the shift differential pays for the employees of his Department.

47. Managing Director Petrowski was employed by Defendants, was under Defendants' direct supervision and control, was granted authority to perform as an agent of Defendants, was acting within the scope of his employment for Defendants, was acting at least in part to serve the interests of Defendants, his employer, and was acting as an agent of Defendants and used his position of power and authority in withholding the approval of the shift differential pays for the employees of his Department.

48. Defendants are liable for the wrongful acts of their employee Managing Director Petrowski under the law of vicarious liability, including the doctrine of *respondeat superior*.

49. In March, 2016, when the final compensation and separation for the Data Center and Critical Infrastructure Department were discussed before the sale of the company, the

Plaintiff and his co-workers inquired of the Director of the Employee Relations of CME GROUP about their shift differential pays.

50. The Director of the Employee Relations responded that the Plaintiff's position was not eligible for shift differential pay under the policy because the rotating and location nature of the position was already taken into consideration in setting the base rate.

51. Plaintiff's final compensation did not include any shift differential pays.

**COUNT I**
**FLSA - OVERTIME WAGES**

52. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 51 of this Complaint, as if fully set forth herein.

53. This count arises from Defendants' violation of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.*, for Defendants' failure to properly pay overtime wages to Plaintiff.

54. Plaintiff worked for Defendants and was an "employee" of Defendants' as defined by section 3(e)(1) of the FLSA, 29 U.S.C. §203(e)(1).

55. Defendants were Plaintiff's "employer" within the meaning of section 3(d) of the FLSA, 29 U.S.C. §203(d).

56. During the course of his employment with Defendants, Plaintiff was not exempt from the overtime wage provisions of the FLSA, 29 U.S.C. §207.

57. Plaintiff was directed by Defendants to work, and did work, in excess of 40 hours per week.

58. Pursuant to 29 U.S.C. §207, for all weeks during which Plaintiff worked in excess of 40 hours, he is entitled to be compensated at a rate of one and one half times his "regular rate of pay" for time worked in excess of 40 hours per week.

59. Employers must include shift differential pay when determining an employee's regular rate of pay. 29 CFR 778.207(b).

60. Defendants did not include the Plaintiff's shift differential pay in his regular hourly rate when paying the Plaintiff his overtime wages.

61. Defendants did not compensate Plaintiff at a rate of one and one half times his "regular hourly rate of pay" for times he worked in excess of 40 hours in individual workweeks.

62. The unpaid overtime wages due to the Defendant's failure to include the Plaintiff's shift differential pay in his regular hourly rate exceeded $ 1,200 in 2011; $ 800 in 2012; $ 800 in 2013; $ 900 in 2014; $ 1,200 in 2015 and $ 600 in 2016.

63. Defendants' failure to pay Plaintiff all of his overtime wages for time worked in excess of 40 hours per week was a violation of the FLSA, 29 U.S.C. §207.

WHEREFORE, Plaintiff prays for a judgment against Defendants as follow:

A. A judgment in the amount of one and one half times Plaintiff's regular rate, shift differential pay included when applicable, for all time Plaintiff worked in excess of 40 hours per week minus any overtime wages that had been previously paid to Plaintiff;

B. Liquidated damages in an amount equal to the amount of unpaid overtime compensation found due;

C. Reasonable attorneys' fees and costs of this action; and

D. Such other and further relief as this Court deems just and appropriate.

### COUNT II
### IMWL - OVERTIME WAGES

64. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 51 of this Complaint, as if fully set forth herein.

65. This Court has supplemental jurisdiction over the matters alleged herein pursuant to 28 U.S.C. §1367.

66. This count arises from Defendants' violation of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq*., for Defendants' failure to properly pay overtime wages to Plaintiff.

67. Plaintiff worked for Defendants and was an "employee" of Defendants' as defined by section 3(d) of the IMWL, 820 ILCS 105/3(d).

68. Defendants were Plaintiff's "employer" within the meaning of section 3(c) of the IMWL, 820 ILCS 105/3(c).

69. During the course of his employment with Defendants, Plaintiff was not exempt from the overtime wage provisions of the IMWL, 820 ILCS 105/4a.

70. Plaintiff was directed by Defendants to work, and did work, in excess of 40 hours per week.

71. Pursuant to 820 ILCS 105/4a, for all weeks during which Plaintiff worked in excess of 40 hours, he is entitled to be compensated at a rate of one and one half times his regular rate of pay for time worked in excess of 40 hours per week.

72. Employers must include shift differential pay when determining an employee's regular rate of pay.

73. Defendants did not include the Plaintiff's shift differential pay in his regular hourly rate when paying the Plaintiff his overtime wages.

74. Defendants did not compensate Plaintiff at a rate of one and one half times his regular hourly rate of pay for times he worked in excess of 40 hours in individual workweeks.

75. The unpaid overtime wages due to the Defendant's failure to include the Plaintiff's shift differential pay in his regular hourly rate exceeded $ 1,200 in 2011; $ 800 in 2012; $ 800 in 2013; $ 900 in 2014; $ 1,200 in 2015 and $ 600 in 2016.

76. Defendants' failure to pay Plaintiff all of his overtime wages for time worked in excess of 40 hours per week was a violation of the IMWL.

77. Pursuant to 820 ILCS 105/12(a), Plaintiff is entitled to recover punitive damages in the amount of two percent (2%) per month of the amount of under payments.

WHEREFORE, Plaintiff prays for a judgment against Defendants as follow:

A.    A judgment in the amount of one and one half times Plaintiff's regular rate, shift differential pay included when applicable, for all time Plaintiff worked in excess of 40 hours per week minus any overtime wages that had been previously paid to Plaintiff;

B.    Punitive damages pursuant to the formula set forth in 820 ILCS 105/12(a);

C.    Reasonable attorneys' fees and costs of this action; and

D.    Such other and further relief as this Court deems just and appropriate.

### COUNT III
### IWPCA - UNPAID WAGES

78. Plaintiff hereby re-alleges and incorporates paragraphs 1 through 51 of this Complaint, as if fully set forth herein.

79. This Court has supplemental jurisdiction over the matters alleged herein pursuant to 28 U.S.C. §1367.

80. This count arises from Defendants' violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/2 *et seq.*, for Defendants' failure to pay Plaintiff all of his earned wages.

81. Plaintiff worked for Defendants and was an "employee" of Defendants' as defined by section 2 of the IWPCA, 820 ILCS 115/2.

82. Defendants were Plaintiff's "employer" within the meaning of section 2 of the IWPCA, 820 ILCS 115/2.

83. Defendants' failure and refusal to pay Plaintiff for all time worked at the rate agreed to by the parties, including shift differential pays and other pays to be determined by the "regular rate" that includes shift differential pays, violated the IWPCA.

WHEREFORE, Plaintiff prays for a judgment against Defendants as follow:

A. A judgment in the amount of all back wages due as provided by the IWPCA;

B. Prejudgment interest on the unlawful deductions in accordance with 815 ILCS 205/2 and punitive damages pursuant to the formula set forth in 820 ILCS 115/14(a);

C. Reasonable attorneys' fees and costs of this action; and

D. Such other and further relief as this Court deems just and appropriate.

PLAINTIFF DEMANDS JURY TRIAL.

Dated: June 15, 2016

Respectfully submitted,

MICHAEL WALSH

By: /s/ Samuel Shim_____
One of Plaintiff's Attorneys

LAW OFFICES OF SAMUEL SHIM
Attorney for Plaintiff
3501 Algonquin Road, Suite 600
Rolling Meadows, IL 60008
(847) 427-0033
Email: sshim.law@gmail.com, rosabaekim.esq@gmail.com

12