**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL WALSH, individually and on behalf of all others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**CHICAGO MERCANTILE EXCHANGE, INC., and CME GROUP, INC.,**<br><br>Defendants. | No. 16-cv-6224<br><br>Honorable Judge Manish Shah<br><br>Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

David K. Haase
Stephanie L. Mills-Gallan
**LITTLER MENDELSON, P.C.**
321 North Clark Street
Suite 1000
Chicago, IL 60654
312.372.5520
*dhasse@littler.com*
*smillsgallan@littler.com*

## I.     INTRODUCTION

Plaintiff Michael Walsh ("Plaintiff") brings wage claims against Defendants, Chicago Mercantile Exchange Inc. ("CME") and CME Group Inc. ("CME Group") (collectively, "Defendants").  Plaintiff claims that CME Group's Shift Differential Policy ("Shift Differential Policy" or the "Policy") created an employment contract or agreement between CME and Plaintiff pursuant to which Plaintiff was entitled to shift differential pay.  From that, Plaintiff alleges that he was underpaid both in his regular and overtime hours in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, Illinois's Minimum Wage Law ("IMWL"), 820 ILCS 105/1, *et seq.*, and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.*  Defendants move for summary judgment on all claims.

The IWPCA does not independently create any rights to wages or overtime, but rather, requires employers to pay wages according to the contract or agreement between the parties. The Court should grant summary judgment to Defendants on Plaintiff's IWPCA claim because his deposition testimony confirms his understanding that he would <u>not</u> receive a shift differential in his pay.  This understanding is consistent with the terms of his job offer letter and the language of the Shift Differential Policy.  Plaintiff's admissions confirm that there was no contract or agreement between him and Defendants entitling him to a shift differential and, as a result, his IWPCA claim fails as a matter of law.

Plaintiff's FLSA and IMWL claims are tied to the fate of his IWPCA claim; the wage statutes require overtime wages to be calculated based on an employee's "regular rate" of pay. Because Plaintiff was not entitled to receive a shift differential in the first instance, his "regular rate" of pay did not include a shift differential.  He is consequently not owed any additional overtime wages.  The Court should therefore grant summary judgment to Defendants on Plaintiff's FLSA and IMWL claims as well.

## II.   STATEMENT OF MATERIAL FACTS[1]

### A.   CME's Data Center & Critical Infrastructure Department

CME is a derivatives exchange on which futures contracts and options on futures contracts are traded via an electronic trading platform and a physical trading floor.  (DSF ¶ 1).  CME operates as a wholly owned subsidiary of CME Group.  (DSF ¶ 2).

In June 2008, CME created a separate department called the Data Center & Critical Infrastructure Department ("DCCI"), responsible for, among other things, the daily operation of CME's data centers and critical infrastructure sites, including their electrical, mechanical, and HVAC systems.  (DSF ¶ 6).  CME's data centers house the servers for the CME Globex electronic trading platform.  (DSF ¶ 7).  Robert Petrowski was the Managing Director of the DCCI.  (DSF ¶ 8).  Other than Mr. Petrowski, DCCI management included Wayne Bearden and Michael Briskey, who both directly reported to Mr. Petrowski.  (DSF ¶ 9).  The DCCI was primarily staffed by positions titled, "Supervisors Building Operations" and "Lead Supervisors Building Operations," both of which were non-exempt hourly positions.  (DSF ¶ 10).

In or around 2010, CME began hiring additional non-exempt DCCI employees to staff a new data center in Aurora, called DC3.  (DSF ¶ 11).  At the beginning of that hiring process, Mr. Petrowski worked with Mr. Bearden and the Human Resources Department to set a starting hourly rate for the new DCCI employees.  (DSF ¶ 12).  Mr. Petrowski took a number of factors into consideration, including: the salary range for similar positions in the market; the rotating nature of the time and location of work shifts; the need to work overtime and weekends; and the type of work that the employees would be performing.  (DSF ¶ 13).  All of these factors were

---

[1] Pursuant to Local Rule 56.1(a)(3), Defendants' Local Rule 56.1 Statement of Undisputed Material Facts is incorporated herein by reference and cited as ("DSF ¶ __").  The cited portions of depositions (and all exhibits) are contained in Defendants' Appendix of Exhibits in Support of Their Motion for Summary Judgment.

considered in determining the base rate of pay offered for these positions. (DSF ¶ 13). Thus, the expectation of working multiple shifts was "baked into" the base rate. (DSF ¶ 13).

During his interviews with each new DCCI employee, Mr. Bearden had a practice of explaining that the hourly rate for the position would be set near the midpoint of market range for similar positions because the employees would be rotating shifts for 24/7 coverage of the DCCI. (DSF ¶ 14). The words "shift differential" never came up during Mr. Bearden's interviews with prospective employees, including Plaintiff. (DSF ¶ 14).

**B.      Plaintiff's Employment With CME**

In or around December 2010, Plaintiff applied for a Supervisor Building Operations position in the DCCI. (DSF ¶ 15). During his interview with Mr. Bearden, Mr. Bearden told Plaintiff that Plaintiff would be rotating shifts and covering different data centers. (DSF ¶ 16). Mr. Bearden testified that, consistent with his interviewing practice, he told Plaintiff that the hourly rate for the position would be set near the midpoint of market range for similar positions because the employees would be rotating shifts for 24/7 coverage of the DCCI. (DSF ¶ 17). Plaintiff does not recall Mr. Bearden saying anything about his starting pay during this interview other than that it would be $34 per hour. (DSF ¶ 18). The words "shift differential" never came up during Mr. Bearden's interview with Plaintiff. (DSF ¶ 19).

On December 16, 2010, CME made Plaintiff an offer of employment as Supervisor Building Operations, at a starting pay of $34.00 hourly, and reporting to Mr. Bearden. (DSF ¶ 20). Plaintiff's job offer letter did not reference a "shift differential". (DSF ¶ 21). Plaintiff admits that a shift differential was never mentioned to him prior to the start of his employment with CME. (DSF ¶ 22). Plaintiff accepted CME's offer of employment and began working for CME on January 10, 2011. (DSF ¶ 23). At all times, Plaintiff was employed as an at-will employee of CME. (DSF ¶ 24).

Plaintiff was employed with CME until March 31, 2016, when his employment was terminated as part of the sale of DC3 to CyrusOne, at which time Plaintiff became an employee of CyrusOne. (DSF ¶¶ 61, 72-73). Plaintiff's claims stem from his employment in the DCCI.

### C.    CME's Unwritten Shift Differential Practice

When Plaintiff began his employment with CME in January 2011, CME did not have a written shift differential policy. (DSF ¶¶ 23, 25). Instead, CME administered an unwritten shift differential practice based on historical practice and the portions of the CME Employee Handbook and the CME Group Compensation Guide that grant management discretion relating to employee work hours and employee compensation. (DSF ¶ 26). CME's shift differential practice was discretionary. (DSF ¶ 27). Mr. Petrowski never approved the payment of a shift differential to anyone in the DCCI, including Plaintiff, pursuant to CME's unwritten shift differential practice. (DSF ¶ 28). Thus, neither Plaintiff nor any of the other DCCI employees was entitled to receive a shift differential pursuant to this unwritten practice. (DSF ¶ 29).

### D.    Plaintiff's Allegations Regarding CME's Unwritten Shift Differential Practice

Plaintiff testified that, in the first week of his employment, he opened his PeopleSoft Human Resources profile and saw a notation stating that he was "second shift 10 percent shift differential". (DSF ¶ 30). Plaintiff further testified that he showed one of his DCCI co-workers the notation. (DSF ¶ 30). The co-worker indicated that he was not receiving shift differential pay from CME. (DSF ¶ 30). The next day, Plaintiff allegedly approached Mr. Petrowski to tell him that a DCCI co-worker had seen the "second shift 10 percent shift differential" notation on Plaintiff's PeopleSoft Human Resources profile.[2] (DSF ¶ 31). Plaintiff purportedly stated to Mr. Petrowski: "I'm sorry that I let [the co-worker] see that." (DSF ¶ 31). According to Plaintiff,

---

[2] Defendants would dispute a number of these facts at trial, including this alleged conversation between Plaintiff and Mr. Petrowski, but they can be assumed to be true for purposes of Defendants' Motion.

Mr. Petrowski said in response: ""[D]on't worry about what you did, Mike, that's fine. There is a shift differential. There is a shift differential." (DSF ¶ 31). Plaintiff alleged he replied: "[O]kay, sorry about that" and the conversation ended. (DSF ¶ 31). Mr. Petrowski did not say anything else to Plaintiff about a shift differential during this purported conversation or at any other time during Plaintiff's employment with CME. (DSF ¶ 31).

Plaintiff was erroneously paid a 10% shift differential in his first paycheck from CME. (DSF ¶ 32). The differential payment was recouped in Plaintiff's second paycheck. (DSF ¶ 32). Plaintiff did not realize that the shift differential payment had been clawed back for "a month to two months". (DSF ¶ 33). By April 2011, Plaintiff realized the payment had been clawed back, and as of that time, he never again expected to receive a shift differential from CME. (DSF ¶ 34). In fact, never again did Plaintiff receive a shift differential from CME. (DSF ¶ 35).

Plaintiff further testified that, at an unidentified point in time, he had "googled and found" a May 6, 2010 blog post, in which an employee from a different CME department stated that he "receives a 10 percent differential in his pay for his working hours." (DSF ¶¶ 36-37).

Plaintiff admits that no one in CME management or Human Resources ever told him that he was entitled to receive a shift differential pursuant to CME's unwritten shift differential practice. (DSF ¶ 38).

### E.     CME's Discretionary Shift Differential Policy

In April 2012, CME published a written Shift Differential Policy, which remained unchanged through March 31, 2016, Plaintiff's last day of employment with CME. (DSF ¶¶ 39, 72). The Policy sets forth the eligibility criteria for shift differential pay and the procedure to qualify for and receive shift differential pay, including the approvals necessary to implement shift differential pay. (DSF ¶ 41). The section of the Shift Differential Policy titled "Scope" states that employees "**may** be eligible to receive shift differential pay" and departments "**may**

institute shift differential pay for their employees." (DSF ¶ 42) (emphasis added). The Policy grants management discretion to decide whether or not to seek to apply the Policy to employees working a qualifying shift. (DSF ¶ 43).

The Policy requires management approval in order to pay shift differential pay to an employee. (DSF ¶ 45). Section 4.2 of the Policy specifies that, in order to provide an employee with shift differential pay, managers must complete a PeopleSoft Employee Record Change (PERC) form and submit it to Human Resources. (DSF ¶ 46). "The PERC form providing an employee with shift differential pay requires [Managing Director] approval." (DSF ¶ 46).

A link to the Shift Differential Policy was created under the "Human Resources Policies" tab on OpenExchange, CME's employee intranet. (DSF ¶ 48). This is the only place where the Shift Differential Policy was made publicly available to CME employees. (DSF ¶ 48).

By July 18, 2012, Jason Tolsky, Director Compensation, the author and individual responsible for implementation and administration of the Shift Differential Policy, became aware that the non-exempt employees in the DCCI were not being paid a shift differential based on a decision made by DCCI management. (DSF ¶¶ 40, 50). Mr. Tolsky accepted the decision made by DCCI management as allowable under the Policy. (DSF ¶ 51).

Mr. Petrowski, DCCI's Managing Director, never approved the payment of a shift differential to anyone in the DCCI, including Plaintiff, pursuant to CME Group's Shift Differential Policy. (DSF ¶ 52). Thus, neither Plaintiff nor any of the other DCCI employees was entitled to receive a shift differential pursuant to the Shift Differential Policy. (DSF ¶ 53).

## F. Plaintiff's Allegations Regarding CME Group's Shift Differential Policy

Plaintiff testified that, at some point in late 2013, he was looking at the Human Resources policies on the intranet (OpenExchange) and "happened to see" the Shift Differential Policy for the first time. (DSF ¶¶ 48, 54). He did not contact anyone in Human Resources or management

-6-

to inquire about the Policy at that time. (DSF ¶ 55). Plaintiff admits that, even after he saw the Policy for the first time in late 2013, "[he] knew [he] wouldn't" receive a shift differential in any of his future paychecks. (DSF ¶ 56).

On April 21, 2014, Plaintiff called Liz Francis, Director, Employee Relations, to ask whether he should be receiving shift differential pay pursuant to CME Group's Shift Differential Policy. (DSF ¶ 57). Ms. Francis reached out to Mr. Tolsky to ask whether Plaintiff was eligible to receive a shift differential under the Policy. (DSF ¶ 58). Mr. Tolsky explained to Ms. Francis that the non-exempt employees in the DCCI were not paid a shift differential based on a decision made by DCCI management. (DSF ¶ 59). After communicating with Mr. Tolsky, Ms. Francis told Plaintiff that certain departments, including the DCCI, did not pay the shift differential to employees working off-shift. (DSF ¶ 60).

On March 10, 2016, during a meeting about the impending sale of CME's data center in Aurora, DC3, to CyrusOne, one employee raised the issue of shift differential pay to Ms. Francis. (DSF ¶¶ 61-63). The other DCCI employees working at DC3, including Plaintiff, subsequently reached out to Ms. Francis, raising the same issue. (DSF ¶ 64). Ms. Francis spoke with Mr. Petrowski and again reached out to Mr. Tolsky to ask whether the non-exempt DCCI employees were eligible to receive a shift differential under the Shift Differential Policy. (DSF ¶¶ 66-67). Her communications with Mr. Petrowski and Mr. Tolsky confirmed that the non-exempt employees in the DCCI were not paid a shift differential based on a decision made by DCCI management. (DSF ¶ 68). On March 24, 2016, Ms. Francis told the non-exempt DCCI employees, including Plaintiff, that they were not eligible to receive shift differential pay under CME Group's Shift Differential Policy based on a decision made by management. (DSF ¶ 69). In her individual response to Plaintiff, Ms. Francis also reminded him that he became aware that

he would not receive shift differential pay shortly after he was hired in January 2011 when he was erroneously paid a shift differential and that pay was clawed back. (DSF ¶ 70).

Plaintiff admits that no one in CME management or Human Resources ever told him that he was entitled to receive shift differential pay pursuant to CME Group's Shift Differential Policy. (DSF ¶ 71).

## III.  ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact will be found to exist only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" on the claim. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). While evidence in the record is to be construed in the favor of the non-movant, the non-movant may only defeat summary judgment by setting forth specific facts showing that there is a genuine factual issue for trial. *Id.* at 255. To meet this standard, the non-movant "must do more than raise some metaphysical doubt as to the material facts; [it] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ*., 458 F.3d 620, 628 (7th Cir. 2006) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). A dispute over irrelevant or unnecessary facts does not preclude summary judgment. *See Hardin v. S.C. Johnson & Son, Inc*., 167 F.3d 340, 344 (7th Cir. 1999).

### B.  Defendants Are Entitled To Summary Judgment On Plaintiff's IWPCA Claim

The undisputed facts demonstrate a lack of agreement between Plaintiff and Defendants for shift differential pay, which is fatal to Plaintiff's claims under the IWPCA. Among its other

provisions, the IWPCA requires employers to timely pay earned wages to their employees. 820 ILCS 115/3 to 115/5. Wages are defined as "compensation owed . . . pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. The IWPCA merely "requires that the employer honor his contract; it does not, however, confer rights to compensation that are absent from the employee's contract or employment agreement." *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1175 (N.D. Ill. 2016) (citations omitted), *aff'd* 843 F.3d 660 (7th Cir. 2016). Accordingly, in order to prevail on an IWPCA claim, a plaintiff must first show that he had a valid contract or agreement entitling him to the wages sought. *Id.* at 1176.

### 1. Plaintiff Has No Factual Basis To Support His Claim To Shift Differential Pay Before The Publication Of The Shift Differential Policy In April 2012

During Plaintiff's deposition, his counsel clarified that Plaintiff's claims are made for a three year period, *i.e.*, from June 16, 2013 through July 15, 2016.[3] (**Appendix Exhibit 1**, Excerpts from the Deposition Transcript of Michael Walsh ["Walsh Dep."], 157:5-17). For that reason, Plaintiff has waived any claims based on CME's unwritten shift differential practice prior to April 2012 (the "pre-policy claims"). *See, e.g.*, *Uncle Henry's Inc. v. Plaut Consulting Co., Inc.*, 399 F.3d 33, 49 (1st Cir. 2005) ("[Plaintiff] made an affirmative representation to the court and opposing counsel, and the district court was entitled to hold [Plaintiff] to it.").

Even if this were not the case, Plaintiff's pre-policy claims fail on their merits. These claims purportedly rest on: (1) Mr. Petrowski's sole alleged comment: "There is a shift differential. There is a shift differential." in January 2011; and (2) the 2010 blog post in which an employee from a *different* CME department states that he "receives a 10 percent differential

---

[3] Defendants communicated Plaintiff's waiver to the Court in their December 23, 2016 Opposition to Plaintiff's Motion to Compel. (Dkt. No. 21, p. 1 and fn. 3). In his reply brief, Plaintiff did not object or attempt to clarify his waiver. (Dkt. No. 23). Defendants again communicated Plaintiff's waiver to the Court in their April 10, 2017 Opposition to Plaintiff's Second Motion to Compel. (Dkt. No. 27). Plaintiff did not object or attempt to clarify his waiver in his reply brief (Dkt. No. 28) or when asked about it by the Court during the April 11, 2017 hearing on Plaintiff's Motion.

in his pay for his working hours." (DSF ¶¶ 31, 36-37). These facts are wholly insufficient to give rise to "an employment contract or agreement between the 2 parties," as is required by the IWPCA. *See* 820 ILCS 115/2.

Assuming, *arguendo*, that Mr. Petrowski told Plaintiff "[t]here is a shift differential", the mere acknowledgment that a shift differential exists at CME does not constitute an agreement by Defendants to pay *Plaintiff* a shift differential. Moreover, the clawback of the erroneous payment of the shift differential to Plaintiff in January 2011, the lack of payment of a shift differential to Plaintiff at any time after that, Plaintiff's failure to complain about that fact for years, and Plaintiff's admission that he did not expect to receive a shift differential again once he saw that the prior payment had been clawed back, all evidence that there was no such agreement.

Further, the May 6, 2010 blog post on which Plaintiff relies merely reflects inadmissible, unsworn hearsay of another CME employee. Even if those evidentiary shortcomings could be ignored, the blog post was not authored or published by Defendants[4], does not suggest a department-wide, let alone a company-wide, policy or practice, and does not refer in any way to Plaintiff, the DCCI or CME's data centers. (**Appendix Exhibit 10**, Blog Post Produced by Plaintiff). Plaintiff's theory that this blog post created an agreement to pay Plaintiff a shift differential utterly lacks merit as a matter of law.

### 2. CME's Written Discretionary Shift Differential Policy Did Not Create An Agreement Or Contract Entitling Plaintiff To Shift Differential Pay

Plaintiff contends that CME Group's Shift Differential Policy created an employment contract or agreement entitling him to shift differential pay. Once again, based on the representations of his counsel limiting Plaintiff's claims to a three-year period, Plaintiff has

---

[4] It appears that the post is linked to a Catherine Durkin's WordPress Blog. (**Appendix Exhibit 10**, Blog Post Produced by Plaintiff). According to her WordPress blog, in 2010, Ms. Durkin was a journalism graduate student at DePaul University. *See* https://cdurkin2.wordpress.com/ (last accessed May 12, 2017). She has no apparent connection to Defendants.

waived any claims he may have under CME Group's Shift Differential Policy prior to June 16, 2013.  (*See* discussion *supra*, at III.B.1).

In order for his IWPCA claim to survive summary judgment, Plaintiff must demonstrate "'a manifestation of mutual assent' from *both* parties about the purported terms" of the contract or agreement he contends entitles him to shift differential pay.  *Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2015 U.S. Dist. LEXIS 37440, at *15 (N.D. Ill. Mar. 25, 2015) (emphasis in original). He cannot do so here.[5]  On the contrary, the record is replete with undisputed facts demonstrating that there was **no agreement or mutual assent** by Defendants to pay Plaintiff a shift differential.

The language of CME Group's Shift Differential Policy itself does not create an agreement entitling Plaintiff to shift differential pay.  The relevant section of the Policy states:

> 2.0 Scope
>
> 2.1    All U.S. and international employees of the following CME Group Inc. companies, up to and including the level of Senior Director **may be eligible** to receive shift differential pay: Chicago Mercantile Exchange Inc., . . . .
>
> Only those departments with jobs requiring continual coverage, **as approved by management**, during qualifying shifts **may institute shift differential pay** for their employees . . . .

(**Appendix Exhibit 5**, Declaration of Jason Tolsky ["Tolsky Decl."], Ex. A) (emphasis added). The language in the Policy is permissive and does not mandate the payment of a shift differential under any circumstances.  (DSF ¶¶ 43, 47).  *See, e.g.*, *Prof'l Exec. Ctr. v. La Salle Nat'l Bank*, 570 N.E.2d 366, 373 (Ill. App. Ct. 1st Dist. 1991) ("Illinois courts interpret the word 'may' as permissive . . . in private contracts.").  Such permissive language cannot create an enforceable

---

[5] Plaintiff cannot even demonstrate his *own* assent to the payment of a shift differential pursuant to the Policy before late 2013.  Plaintiff testified that he did not see the Shift Differential Policy for the first time until late 2013.  (DSF ¶ 54).  Plaintiff could not have consented to terms of an agreement of which he was unaware.  As a result, Plaintiff's IWPCA claim based on the time period before he saw the Policy fails as a matter of law.  *Schneider*, 2015 U.S. Dist. LEXIS 37440, at *15 (IWPCA requires "'a manifestation of mutual assent' from *both* parties about the purported terms" of the contract or agreement).

contract to pay a shift differential to all employees working a qualifying shift as a matter of law. *Compare Frank v. S. Suburban Hosp. Found.*, 628 N.E.2d 953, 959 (Ill. App. Ct. 1st Dist. 1993) (progressive discipline policy granting management discretion did not create enforceable contract), *with Duldulao v. St. Mary of Nazareth Hosp.*, 505 N.E.2d 314, 318 (Ill. 1987) (mandatory language in handbook such as "termination . . . *cannot occur* without prior notice and investigation" and "employees *are never* dismissed without prior written admonitions and/or an investigation", without disclaimers, was a clear promise to employees) (emphasis in original).

Consistent with the permissive language, the Policy requires management approval in order to pay a shift differential to a department. (DSF ¶ 45). In addition, to provide an employee with shift differential pay, managers must complete a PERC form, which requires Managing Director approval. (DSF ¶ 46). Mr. Petrowski, DCCI's Managing Director, never approved the payment of a shift differential to anyone in the DCCI, including Plaintiff. (DSF ¶ 52). Without any Managing Director approval to pay Plaintiff a shift differential, the Policy alone could not have created a binding agreement entitling Plaintiff to shift differential pay.

Plaintiff cannot point to any facts demonstrating CME's assent to pay him a shift differential pursuant to the Policy. On the contrary, on the sole occasion that Plaintiff asked Human Resources whether he was entitled to receive a shift differential under CME Group's Shift Differential Policy, in April 2014, he was clearly told "no". (DSF ¶¶ 57, 60). And again, when the issue was raised in March 2016, the non-exempt DCCI employees, including Plaintiff, were clearly told that they were <u>not</u> eligible to receive shift differential pay. (DSF ¶¶ 69-70). Plaintiff admits that no one in CME management or Human Resources ever told him that he was entitled to receive a shift differential during his employment at CME. (DSF ¶¶ 38, 71). The undisputed material facts defeat Plaintiff's claims under the IWPCA. *See, e.g., Cohan*, 170 F.

-12-

Supp. 3d at 1176 (summary judgment granted to employer where "the record [was] full of evidence showing that there was no agreement by [the company] to pay commissions in the manner sought by Plaintiffs" because communications from management "consistently confirmed" the way in which commission payments were calculated) (citations omitted).

Importantly, Plaintiff's own testimony undermines any assertion that he believed that the Shift Differential Policy created a valid agreement between the parties for Defendants to pay him a shift differential.  Plaintiff admits that even after he saw the Policy for the first time in late 2013, "[he] knew [he] wouldn't" receive a shift differential in any of his future paychecks.  (DSF ¶ 56).  His testimony confirms that Defendants never manifested their assent to pay Plaintiff a shift differential pursuant to the Policy.

Thus, there is no evidence that would allow a finder of fact to conclude that CME Group's Shift Differential Policy created an agreement for Defendants to pay Plaintiff a shift differential.  Plaintiff's IWPCA claim fails as a matter of law.  *See Cohan*, 170 F. Supp. 3d at 1175-1176.

### 3. Any Viable IWPCA Claim To Shift Differential Pay Is Defeated By Plaintiff's Implied Acceptance Of Defendants' Payment Terms

Even if the language of the Policy could reasonably be interpreted as an agreement to pay Plaintiff a shift differential, which Defendants deny, that agreement was modified when Defendants chose not to pay Plaintiff a shift differential after the Policy was implemented in April 2012 and Plaintiff continued to work under the terms of the modified agreement.

Under Illinois law, "[w]hen an employment agreement is terminable at will, it may be modified by the employer as a condition of its continuance."  *Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 1st Dist. 2003) (citations omitted).  The employer's right to unilateral modification extends to terms of compensation.  *Id*.  "[C]ontinuance under the modified

conditions is both acceptance of the new terms and consideration in return for new wages paid." *Kamboj v. Eli Lilly and Co.*, No. 05 C 4023, 2007 U.S. Dist. LEXIS 4259, at *27 (N.D. Ill. Jan. 18, 2007) (citations omitted).

Plaintiff was employed as an at-will employee of CME. (DSF ¶ 24). Once he realized that the 10% shift differential in his first paycheck from CME had been clawed back, by April 2011, he concedes that he never again expected to receive a shift differential from CME. (DSF ¶ 34). Plaintiff continued coming to work for **five years** after this realization; he continued collecting his paycheck, without any protest. Even after seeing the Policy in late 2013, "[he] knew [he] wouldn't" receive a shift differential in any of his future paychecks. (DSF ¶ 56). In April 2014, Plaintiff asked Human Resources about shift differential pay and was told he would not receive it. (DSF ¶¶ 57, 60). Yet, he continued to work under those terms. Indeed, Plaintiff did not protest CME's decision not to pay him a shift differential until he filed this lawsuit on June 15, 2016, almost three months *after* his employment with CME was terminated. (DSF ¶¶ 72, 74). This type of evidence confirms an implied acceptance of Defendants' terms of compensation, which defeats Plaintiff's IWPCA claim. *See Cohan*, 170 F. Supp. 3d at 1176 (summary judgment granted to employer on IWPCA claim where plaintiffs conceded their understanding of employer's approach to calculating commissions and continued working for years thereafter, despite their assertions that commissions should have been calculated differently pursuant to employer's Compensation Plans); *cf. Kamboj*, 2007 U.S. Dist. LEXIS 4259, at *28 ("[Plaintiff] accepted the 'modified' terms by continuing to work a full year after this discovery – notwithstanding that the terms were inconsistent with the alleged oral terms created by [her supervisor]. [Plaintiff] has no claim for breach of contract . . . .").

For the reasons set forth above, and based on the undisputed facts in the record,

Defendants are entitled to summary judgment on Plaintiff's IWPCA claim.

**C.    Defendants Are Entitled To Summary Judgment On Plaintiff's FLSA and IMWL Claims**

The FLSA and IMWL require employers to compensate non-exempt employees at a rate of one and one-half times their "regular rate" of pay for hours worked in excess of 40 hours in individual workweeks.  29 U.S.C. § 207(a); 820 ILCS 105/4a.  The statutes do not mandate the payment of a shift differential for non-standard work shifts.  *See generally* 29 U.S.C. § 201 *et seq.* and 820 ILCS 105/1 *et seq.*; *see also* U.S. Dep't of Labor, elaws – Fair Labor Standards Act Advisor, *Is extra pay required for weekend or night work?*, http://webapps.dol.gov/elaws/faq/esa/flsa/005.htm ("Extra pay for working night shifts is a matter of agreement between the employer and the employee (or the employee's representative). The [FLSA] does not require extra pay for night work.").  Only if an employee is entitled to a premium rate pursuant to an applicable employment contract must that premium rate be included in the calculus of an employee's "regular rate of pay" for the purposes of overtime.  *See* 29 U.S.C. § 207(e)(7); 29 C.F.R. § 778.207(b); 56 Ill. Admin. Code 210.410.

Plaintiff claims that Defendants violated the FLSA and IMWL because they did not include a shift differential when calculating Plaintiff's overtime wages.  (Dkt. No. 1, Complaint, ¶¶ 60-63, 72-74).  As discussed above, Plaintiff has not shown an agreement or contract entitling him to a shift differential.  Therefore, Defendants were not required to include a shift differential in the calculus of Plaintiff's "regular rate" of pay for purposes of overtime wages.  Plaintiff's FLSA and IMWL claims thus fail as a matter of law.

**IV.    CONCLUSION**

For each of the foregoing reasons, Defendants are entitled to summary judgment on all claims alleged in Plaintiff's Complaint.

Dated:  May 15, 2017      Respectfully submitted,

                CHICAGO MERCANTILE EXCHANGE
                INC., and CME GROUP INC.,


                */s/ Stephanie L. Mills-Gallan*
                   *One of Their Attorneys*

David K. Haase  (ARDC# 6201278)
Stephanie L. Mills-Gallan (ARDC #6313506)
Littler Mendelson, P.C.
321 North Clark Street, Suite 1000
Chicago, IL  60654
Telephone: (312) 372-5520
Facsimile: (312) 372-7880
*dhaase@littler.com*
*smillsgallan@littler.com*

## <u>CERTIFICATE OF SERVICE</u>

I, Stephanie L. Mills-Gallan, an attorney, certify that on May 15, 2017, I electronically

filed ***Defendants' Memorandum Of Law In Support of Their Motion For Summary Judgment***

via the CM/ECF filing system with the United States District Court for the Northern District of

Illinois, and that the following CM/ECF participants were served with a copy of same through

the CM/ECF filing system:

Samuel Shim
Hyo Jung Kim
LAW OFFICES OF SAMUEL SHIM
3501 Algonquin Road, Suite 600
Rolling Meadows, IL 60008
*sshim.law@gmail.com*
*rosabaekim.esq@gmail.com*

*/s/ Stephanie L. Mills-Gallan*
Stephanie L. Mills-Gallan

Firmwide:146558344.6 059775.1026