**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **MICHAEL WALSH, individually and on behalf of all others similarly situated,** | |
| Plaintiff, | No. 16-cv-6224 |
| v. | Honorable Judge Manish Shah |
| **CHICAGO MERCANTILE EXCHANGE, INC., and CME GROUP, INC.,** | Magistrate Judge Jeffrey T. Gilbert |
| Defendants. | |

## DEFENDANTS' LOCAL RULE 56.1(b)(3) RESPONSE TO PLAINTIFF'S 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS AND DEFENDANTS' LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS[1]

Defendants, Chicago Mercantile Exchange Inc. ("CME") and CME Group Inc. ("CME Group") (collectively, "Defendants"), by and through their attorneys and pursuant to Local Rule 56.1(b)(3), hereby respond to Plaintiff Michael Walsh's ("Plaintiff" or "Walsh") 56.1(a)(3) Statement of Undisputed Facts[2] ("Plaintiff's Statement of Facts") [Doc. No. 41].

---

[1] Defendants' Local Rule 56.1(b)(3) Response to Plaintiff's 56.1(a)(3) Statement of Undisputed Facts sets forth admissions and denials to Plaintiff's alleged facts in accordance with Defendants' obligation to respond for purposes of resolution of the parties' cross-motions for summary judgment, but shall in no way constitute admissions or denials of facts outside the context of the parties' cross-motions for summary judgment.

[2] Plaintiff lists 78 "material" facts that purportedly entitle him to summary judgment but only cites to twelve (12) paragraphs in the argument section of his brief, with three of those paragraphs simply copying and pasting the text from sections of the Shift Differential Policy. (*See* Doc. No. 43, Plaintiff's Memorandum Of Law In Support Of His Motion For Partial Summary Judgment at 9-15 (citing paragraphs 35, 37-40, 42, 44, 54-55, and 64-66)). Defendants contend that many of the factual assertions contained in Plaintiff's 78 paragraphs, even if true, are not material to any claim or defense at issue in this litigation, specifically as to the question of whether Plaintiff was entitled to shift differential pay pursuant to CME Group's Shift Differential Policy and in violation of the FLSA, IMWL, or the IWPCA.

**DEFENDANTS' LOCAL RULE 56.1(b)(3) RESPONSE TO
PLAINTIFF'S 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS**

Defendants contend that the majority of these "facts" are wholly unsupported by the cited record evidence and are nothing more than pure conjecture and argument from counsel. Some of Plaintiff's assertions are even controverted by the record evidence. Plaintiff's Statement of Facts thus fails to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1, and his unsubstantiated assertions should be disregarded for the purposes of the parties' cross-motions for summary judgment. To the extent the Court determines that any of Plaintiff's paragraphs contains a proper statement of fact, Defendants respond to Plaintiff's Statement of Facts as follows:

1. Plaintiff Michael Walsh is a former employee of the defendant Chicago Mercantile Exchange, Inc. ("CME") (Ex. 18, Answer to Complaint, Para. 6)

**RESPONSE:** Undisputed.


2. CME is what the company used to be called before CME bought other companies and the company is now known as the CME Group, Inc. ("CME Group"). (Ex. 20, Francis Dep. pp. 17-18)

**RESPONSE:** Disputed. Defendants object to this paragraph on the grounds that it represents the personal opinion of CME employee Elizabeth Francis ("Francis") and, therefore, the cited testimony is not admissible evidence. Defendants admit that CME operates as a wholly owned subsidiary of Defendant CME Group. (Doc. No. 9, Defendants' Answer And Affirmative Defenses To Plaintiff's Complaint, ¶ 13). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.


3. Defendants' policies apply across the board to all of the CME Group employees. (Ex. 20, Francis Dep. pp. 39-40)

**RESPONSE:** Disputed. Defendants object to this paragraph on the grounds that it represents the personal opinion of Francis and, therefore, the cited testimony is not admissible evidence. Moreover, Defendants deny that this paragraph is fully supported by the cited materials.

4. Defendants are a trading exchange company (Ex. 20, Francis Dep. p. 18) and registered to do business in Illinois. (Ex. 18, Answer to Complaint Paras. 10, 14).

**RESPONSE:** Undisputed.

5. Jurisdiction is proper (Ex. 18, Answer to Complaint, Para. 3) for the FLSA claim pursuant to 28 U.S.C. §1331 arising under 29 U.S.C. §206(b) and for other claims pursuant to 28 U.S.C. §1367.

**RESPONSE:** Partially disputed but not material. Defendants admit that jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367, and 29 U.S.C. § 207(a).

6. Venue is proper (Ex. 18, Answer to Complaint, Para. 4) because the events alleged in the complaint took place within the Northern District of Illinois.

**RESPONSE:** Undisputed.

7. Since around 2001, the defendants actively purchased other companies, such as New York Mercantile Exchange ("NYMEX") (Ex. 29, Briskey Dep. p. 33; Ex. 25, Holda Dep. p. 199), Chicago Board of Trade ("CBOT") (Ex. 25, Holda Dep. pp. 81, 199) and other companies, so as of April, 2012, CME Group included Chicago Mercantile Exchange, Inc., CME Group Clearing Europe, CME Operations Ltd., GFX Corporation, CBOT Market Data Services LLC, and New York Mercantile Exchange, Inc. (Ex. 1, Shift Differential Policy; Ex. 20, Francis Dep. pp. 17-18)

**RESPONSE:** Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials, and further maintain that the cited testimony is inadmissible opinion evidence that further is outside the scope of the witnesses' knowledge).

8. CME Group's expansion required extensive and frequent construction or remodeling projects. (Ex. 25, Holda Dep. pp. 78-81, Ex. 26, Bercher Dep. pp. 9-14)

**RESPONSE:** Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials, and further maintain that the cited testimony is inadmissible opinion evidence that further is outside the scope of the witnesses' knowledge).

9. Initially, defendants had two data centers: one in Lombard, Illinois ("Remote Data Center" or "RDC") and another at Lakeside Technology Center, 351 East Cermak, Chicago ("Lakeside Technology" or "Annex Data Center" or "ADC"). (Ex. 27, Petrowski Dep. pp. 53-54; Ex. 29, Briskey Dep. p. 25; Ex. 26, Bercher Dep. p.10)

**RESPONSE:** Partially disputed. Defendants admit that, initially, Defendants had one remote data center, RDC, in Lombard, Illinois. Defendants' second remote data center was Lakeside Technology Center, called the Annex or ADC, at 350 East Cermak in Chicago. (Doc. No. 43, Plaintiff's Local Rule 56.1 Statement Of Undisputed Facts In Support Of His Motion For Partial Summary Judgment ["PSF"] Exhibit 29, Briskey Deposition Transcript ["Briskey Dep."], 25:6-9; PSF Exhibit 25, Holda Deposition Transcript ["Holda Dep."], 43:4-9). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

10. Around 2007, defendants bought a building in Aurora, Illinois to be used as the third data center ("Data Center 3" or "DC3"), started construction in 2008, completed the first phase of the construction in 2010, and finished the next phase of the construction, the co-location suites, in late 2011 or 2012 and costumers [sic] for the co-location suites started moving in in February, 2013. (Ex. 27, Petrowski Dep. pp. 63-64)

**RESPONSE:** Partially disputed. Defendants admit that they purchased property in Aurora, Illinois to build a third data center ("Data Center 3" or "DC3"), started construction in 2008, and completed the first phase of the construction in 2010. Defendants further admit that they finished the next phase of the construction, on the co-location suites, in late 2011 or 2012, and people began moving into the co-location suites in February 2013. (Petrowski Dep., 63:23-64:10).

-4-

11.    After the first phase of the construction was completed, employees were manned at DC3 in June or July of 2010. (Ex. 27, Petrowski Dep. p. 44)

**RESPONSE:**  Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).

12.    A data center is comprised of server cabinets, heavy air-conditioning, and heavy, reliable, dependable electric power. (Ex. 27, Petrowski Dep. p. 54)

**RESPONSE:**  Undisputed.

13.    At DC3, IT-Data Center Engineering department employees designed the placement of cables, connections and customer needs at the co-location data center. (Ex. 26, Bercher Dep. pp. 15, 19)

**RESPONSE:**  Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).

14.    Blake Bercher ("Bercher") was a manager of Data Center Engineering ("DCE") since around April, 2010. (Ex. 26, Bercher Dep. p. 16) Bercher also held the title of "Manager Remote Hands" or "Manager - DC3" (Ex. 13, Email Thread, Bercher 017).

**RESPONSE:**  Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).

15.    Bercher oversaw eight employees including Matt Nowak ("Nowak"), Chuck Yelensky ("Yelensky"), Brad Fann ("Fann") and Jaime Garza ("Garza"). (Ex. 26, Bercher Dep. pp. 25-26)

**RESPONSE:**  Partially disputed.  Defendants admit that Blake Bercher testified that he oversaw eight employees, including the aforementioned individuals, as of the date of his deposition, April 13, 2017.  (PSF Exhibit 26, Bercher Deposition Transcript ["Bercher Dep."], 25:15-26:10).  Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

16.    At DC3, Data Centers and Critical Infrastructure department ("DCCI") employees took care of power and cooling and kept the data center running at all times. (Ex. 4-6, Job

-5-

Descriptions at DCCI; Ex. 27, Petrowski Dep. p. 235; Ex. 24, Perez Dep. p. 82) DCCI employees provide building support where they maintain the adequate temperature and otherwise keep the building services in order and make sure everything is running efficiently and effectively 24/7 at the data centers which house, among other things, vast array of computers. (Ex. 20, Francis Dep. p. 64)

**RESPONSE:** Partially disputed. Defendants object to Plaintiff's reliance on PSF Exhibit 4, an unapproved draft Job Description Template, to support this paragraph, because as a draft, it is not competent evidence of the ultimate policy provision. Defendants deny that the non-exempt DCCI employees were responsible for making sure that the data centers were running efficiently and effectively 24/7 but admit that this was the responsibility of the DCCI Managing Director, Robert Petrowski. (*Compare* PSF Exhibit 5, Job Description for Supervisor Building Operations position, *with* PSF Exhibit 6, Job Description for the Managing Director position; *see also* PSF Exhibit 27, Petrowski Deposition Transcript ["Petrowski Dep."], 172:9-173:14, 235:13-18). Defendants object to the cited testimony of Elizabeth Francis on the grounds that it is inadmissible opinion evidence that is outside the scope of her personal knowledge. Defendants admit that the DCCI is responsible for, among other things, the daily operation of CME's data centers and critical infrastructure sites, including their electrical, mechanical, and HVAC systems. (Doc. No. 40, Defendants' Appendix Of Exhibits In Support Of Their Motion For Summary Judgment ["Defs.' App'x."] Exhibit 3, May 12, 2017 Declaration of Robert Petrowski ["Petrowski Decl."], ¶ 3). Defendants also admit that CME's data centers house the servers for the CME Globex electronic trading platform. (Petrowski Decl., ¶ 4). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

17. Robert Petrowski ("Petrowski") was the managing director of DCCI. (Ex. 18, Answer to Complaint Para. 21)

**RESPONSE:** Undisputed.

18.     Wayne Bearden ("Bearden") and Mike Briskey ("Briskey") were line managers working for Petrowski. (Ex. 18, Answer to Complaint Para. 20; Ex. 21, Tolsky Dep. p. 130; Ex. 26 Bercher Dep. p. 29) Bearden left CME in 2014 and after that, Briskey took over Bearden's responsibilities. (Ex. 28 Bearden Dep. p. 8; Ex. 29 Briskey Dep. pp. 85-87).

**RESPONSE:** Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).

19.     During the relevant time period, DCCI employees included Walsh, Edmund Pierce ("Pierce"), Michael Perez ("Mike Perez"), Chris Holda ("Holda"), Oscar Correa ("Correa"), Mike O'Brien ("O'Brien"), John Fahey ("Fahey"), and Paul Gautier ("Gautier").

**RESPONSE:** Partially disputed. Plaintiff has failed to cite to any materials to support this paragraph. Defendants object to Plaintiff's failure to define the "relevant time period". Nevertheless, Defendants admit that Michael Walsh, Edmund Pierce, E. Michael Perez, Christopher Holda, Oscar Correa, Michael O'Brien, John Fahey, and Paul Gautier were non-exempt DCCI employees from April 2011 through March 2016. (Petrowski Dep., 62:21-63:11, 76:7-23, 196:15).

20.     Without the power and cooling services provided by the DCCI department, the DCE department cannot maintain and perform its duties. (Ex. 24, Perez Dep. p. 82)

**RESPONSE:** Disputed. Defendants object to this paragraph on the grounds that it represents the personal opinion of Perez and, therefore, the cited testimony is not admissible evidence.

21.     Around July, 2011, DCCI at DC3 started operating on a 24/7/365 basis. (Ex. 3 DCCI Schedules, CME305)

**RESPONSE:** Undisputed.

22.     Around November, 2011, DCE at DC3 started operating on a 24/7/365 basis. (Ex. 26 Bercher Dep. p.66; Ex. 11 Email, Bercher005)

**RESPONSE:** Undisputed.

23.    DCCI formally came into existence in June, 2008. (Ex. 27 Petrowski Dep. p. 52)

**RESPONSE:**  Undisputed.

24.    Petrowski had approximately eight employees, including Fahey and Holda, working under him in 2008 when DCCI was formed. (Ex. 27, Petrowski Dep. pp.55-56)

**RESPONSE:**  Undisputed.

25.    Fahey was known to be receiving shift differential payment. (Ex. 25, Holda Dep. pp. 102-103, 235)

**RESPONSE:**  Disputed.  Defendants object to this paragraph on the grounds that the cited testimony is inadmissible hearsay.  Defendants further deny that this paragraph is supported by Holda's cited deposition testimony.  During his deposition, Holda testified: "[W]hen I first started working with John Fahey at the Annex Data Center, he may have – he probably told me that there were engineers – because he came from the engineers in the building – that were getting a shift differential." (Holda Dep., 102:24-103:5).  Holda further testified: "I'm going in the way back machine, but I believe that when I started working with John Fahey in 2005, 2006, he was an engineer for CME Group, and I believe he was saying that they were receiving shift differential pay."  (Holda Dep., 235:20-236:1 (emphasis added)).  Holda never suggested that Fahey was receiving shift differential pay while an employee in the DCCI.

26.    DCCI hired more people around 2010 and 2011, including Walsh, Correa, and Pierce. (Ex. 27 Petrowski Dep. pp. 65, 76-77; Ex. 28 Bearden Dep. pp. 30) DCCI did not hire anymore employees after the initial hiring in 2011. (Ex. 29 Briskey Dep. pp. 69-70)

**RESPONSE:**  Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).  Defendants object to Plaintiff's use of the word "initial" hiring as vague and confusing.  Defendants admit that DCCI did not hire any more employees after hiring Wash, Correa, and Pierce in 2011.

27.    Defendants required each department to keep up-to-date job descriptions for the positions. At DCCI, Briskey drafted the job descriptions after discussing with Bearden, which was approved by Petrowski. The essential duty of the DCCI employees was to keep the data centers running 24/7/365. (Ex. 4-6, Job Descriptions; See Ex. 18 Answer to Complaint Para. 42; Ex. 27 Petrowski Dep. pp. 155, 158-162, 164-167, 168-170; Ex. 28 Bearden Dep. pp. 42-43; Ex. 29 Briskey Dep. pp. 105-110)

**RESPONSE:**  Disputed.  Plaintiff has failed to cite to any materials to support the first

sentence of this paragraph.  Defendants deny that the remainder of this paragraph is fully

supported by the cited materials.  (*Compare* PSF Ex. 5, Job Description for Supervisor Building

Operations position, *with* PSF Ex. 6, Job Description for the Managing Director position; *see*

*also* Petrowski Dep., 172:9-173:14, 235:13-18).  Defendants object to Plaintiff's reliance on PSF

Exhibit 4, an unapproved draft Job Description Template, to support this paragraph, because as a

draft, it is not competent evidence of the ultimate policy provision.


28.    As part of their duties, DCCI employees had to respond to the alarms generated at the data centers. (Ex. 4-6, Job Descriptions) All of the DCCI employees were given an iPhone and a laptop computer and were required to look at the alarm and "remote-in" to assess the problem even when they were not on duty since, in major instances, one person would not be enough to bring the systems back up. (Ex. 25 Holda Dep. pp. 44-49)

**RESPONSE:**  Partially disputed.  Defendants deny that this paragraph is fully supported

by the cited materials.  Defendants object to Plaintiff's reliance on PSF Exhibit 4, an unapproved

draft Job Description Template, to support this paragraph, because as a draft, it is not competent

evidence of the ultimate policy provision.  Defendants admit that the DCCI employees had to

respond to alarms generated at the data center where they were working while they were on duty.

Defendants deny that the non-exempt DCCI employees were required to look at the alarm and

"remote-in" to assess the problem even when they were not on duty.  (Petrowski Dep., 163:2-12,

172:9-173:14).   Defendants deny any additional or contrary assertions of this paragraph, and

deny that any such additional or contrary assertions are supported by the cited materials.

29.     The requirement that the data center had to operate 24 hours a day, 7 days a week, 365 days a year was constantly emphasized by Petrowski, Bearden and Briskey. Petrowski would tell the DCCI employees and Bearden and Briskey would repeat the same numerously: "We can never go down. If our data centers for CME Group was down one hour, it would affect the U.S. economy. If it was down for two hours, it would affect the world economy." (Ex. 25 Holda Dep. pp. 42-43)

**RESPONSE:** Undisputed.

30.     Bearden was responsible for coming up with the employee work schedules assigning shifts and locations and distributed them by email upon Petrowski's approval. (Ex. 3 DCCI Schedules; Ex. 29 Briskey Dep. pp. 85-87) Before approving the schedules, Petrowski would ask Bearden "is this going to make everybody happy or unhappy?" and question if the employees who had good reasons, according to Petrowski's standards, such as attending classes, had been accommodated. (See Ex. 27, Petrowski Dep. pp. 61, 88-93, 190-192, 199-200, 238-244) After Bearden left CME, DCCI did not make any changes to the schedule. (Ex. 27 Petrowski Dep. p. 91)

**RESPONSE:** Partially disputed.  Defendants admit that Bearden was responsible for

making the employee schedules assigning shifts and locations, which were distributed by email

to the employees.  (PSF Exhibit 28, Bearden Deposition Transcript ["Bearden Dep."], 27:2-6).

Petrowski would look at the schedules before Bearden emailed them to the employees.

(Petrowski Dep., 88:23-89:7).  Petrowski testified that the only time he remembered ever

questioning Bearden's proposed schedule was to accommodate some of the employees' class

schedules, which occurred the first or second time Bearden made the schedule.  (Petrowski Dep.,

89:10-20, 91:9-20, 200:10-22).  Petrowski would "just look at [the schedules], and say, 'Wayne

[Bearden], is this going to make everybody happy or unhappy?'"  (Petrowski Dep., 190:21-23).

When Bearden left CME, DCCI never changed the schedule again.  (Petrowski Dep., 191:8-18).

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such

additional or contrary assertions are supported by the cited materials.

31.     Petrowski was extremely demanding and despotic and if he said something everyone should just do it. (See Ex. 25 Holda Dep. pp. 87, 154; Ex. 26 Bercher Dep. p. 25) Petrowski would raise his voice and use foul language. (Ex. 28 Bearden Dep. pp. 64-66) Petrowski would

scream and use foul language when employees make mistakes and "let you still have it" even when it was not the employee's mistake. (Ex. 24 Perez Dep. p. 56) Petrowski would threaten employees with termination and DCCI employees were afraid to be on Petrowski's "shit list" and could not really do anything to get back in Petrowski's good graces until he decides to let them back in. (Ex. 25 Holda Dep. pp. 151-152, 154) Petrowski admitted that his conduct was in violation of the CME's harassment policy. (Ex. 27 Petrowski Dep. p. 152)

**RESPONSE:** Partially disputed but not material. Defendants deny that that this paragraph is fully supported by the cited materials. Defendants object to this paragraph on the grounds that it (a) improperly includes multiple, unrelated facts in one paragraph, and (b) includes argument and conclusions by counsel rather than facts supported by materials in the record. Defendants admit that the individuals whose testimony is cited appear to have negative views of Petrowski but deny that the negative opinions stated by these individuals can be taken as facts or generalized as objectively accurate characterizations of Petrowski. Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials. Defendants deny that the allegations in this paragraph are material to any claim or defense at issue in this litigation, and because these assertions so clearly are extraneous and inflammatory, Defendants have refrained from collecting contrary affidavits, but reserve the right to do so at trial.

32. Walsh got on Petrowski's "shit list" at some point during his employment. (Ex. 25 Holda Dep. pp. 154, 213-214)

**RESPONSE:** Partially disputed. Defendants admit that, in Walsh's personal opinion, Walsh got on Bob's "shit list" at some point during his employment. (Holda Dep., 152:8-10). Defendants deny that this opinion is admissible evidence. Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

33. DCCI was sold to another company named CyrusOne as of April 1, 2016 (See Ex. 20 Francis Dep. pp. 51-53, Ex. 27 Petrowski Dep. p. 214) and subsequently sold to CBRE as of

March 31, 2017 but most of its employees are still performing the same duty at DC3 (See Ex. 25 Holda Dep. pp. 34, 92; Ex. 24 Perez Dep. pp. 12-13, 21, 29, 53)

**RESPONSE:** Partially disputed. Defendants admit that DC3 was sold to CyrusOne as of March 31, 2016 and that Plaintiff and others obtained jobs at CyrusOne. (Defs.' App'x. Exhibit 7, May 12, 2017 Declaration of Elizabeth Francis ["Francis Decl."], ¶¶ 12-13, 26-27). Defendants admit that DC3 was sold by CyrusOne to CBRE as of March 31, 2017 and that most of the former DCCI employees working at DC3 are still performing similar job duties. Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

34. Around April, 2012, CME Group published its shift differential policy by posting it on the intranet and sending it as an attachment in an email from the HR to all employees, just like any other policies. (Ex. 1 Shift Differential Policy; See Ex. 20 Francis Dep. pp. 37-40, 151-152; Ex. 21 Tolsky Dep. pp. 32-33Ex. 28 Bearden Dep. pp. 21-22; Ex. 26 Bercher Dep. pp. 71-72; Ex. 22 Walsh Dep. p. 10; Ex. 25 Holda Dep. pp. 123-130; Ex. 24 Perez Dep. p. 64; Ex. 23 Pierce Dep. pp. 68-72)

**RESPONSE:** Partially disputed. Defendants object to this paragraph on the grounds that it is not fully supported by the cited materials, and because it contains inadmissible hearsay. Defendants admit that, in April 2012, CME Group published a written Shift Differential Policy. (PSF Exhibit 1, Shift Differential Policy ["Shift Differential Policy"]; Defs.' App'x. Exhibit 5, May 10, 2017 Declaration of Jason Tolsky ["Tolsky Decl."], ¶ 9). Defendants further admit that a link to the Shift Differential Policy was created under the "Human Resources Policies" tab on OpenExchange, CME's employee intranet. (Tolsky Decl., ¶¶ 19-20; PSF Exhibit 20, Francis Deposition Transcript ["Francis Dep."], 37:12-20; PSF Exhibit 22, Walsh Deposition Transcript ["Walsh Dep."], 85:14-86:8).

Defendants deny that the Shift Differential Policy was sent as an attachment in an email from Human Resources to all employees. Although Wayne Bearden testified that "he believe[s]"

this was the case (Bearden Dep., 22:1-5), his testimony by its own verbiage was speculative and uncertain, and it is not supported by any other evidence in the record. Jason Tolsky, the author and Human Resources individual responsible for implementation of the Shift Differential Policy, testified that OpenExchange is the only place where the Policy was made publicly available to CME employees. (Tolsky Decl., ¶¶ 10, 19). Walsh, Holda, Perez, and Pierce all testified to becoming aware of the Shift Differential Policy from another employee or by accessing the Policy through OpenExchange. (Walsh Dep., 85:14-86:8; Holda Dep., 123:13-25; PSF Exhibit 24, Perez Deposition Transcript ["Perez Dep."], 64:7-13; PSF Exhibit 23, Pierce Deposition Transcript ["Pierce Dep."], 69:3-9). Michael Briskey testified that he had not heard of shift differential pay at CME prior to March of 2016 and had not seen the Shift Differential Policy before his deposition. (Briskey Dep., 37:8-14, 77:2-10). Bercher testified that he had not seen the Shift Differential Policy until the week before his deposition. (Bercher Dep., 77:15-78:22). Defendants deny that this fact is material to any claim or defense at issue in this litigation, in light of Plaintiff's testimony that he was not aware of the Policy until late 2013 when he "happened to see" it on OpenExchange. (Walsh Dep., 85:14-86:8).

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

35. CME Group shift differential policy was a group-wide policy and no one from the department or division was required to do anything to expressly authorize or decide on the applicability to each department or division. (See Ex. 26 Bercher Dep. pp. 88-89) Defendants' policies apply across the board to all of the CME Group employees. (Ex. 20, Francis Dep. pp. 39-40) While divisions and departments may have their particular practices, all of the division and department policies have to comply with the CME Group' policies. (Ex. 21 Tolsky Dep. pp. 142-143)

**RESPONSE:** Partially disputed. Defendants object to this paragraph on the grounds that it improperly includes multiple, unrelated facts in one paragraph.

Defendants deny that the Shift Differential Policy was a group-wide policy and deny that this assertion is supported by the cited materials. On the contrary, the Shift Differential Policy identifies the CME Group companies to which it applies. (Shift Differential Policy, Section 2.1). In addition, the Policy specifies that certain employees are explicitly excluded from the scope of the Policy. (Shift Differential Policy, Section 2.1).

Defendants deny that "no one from the department or division was required to do anything to expressly authorize or decide on the applicability to each department or division." Bercher's cited testimony does not provide any support for this assertion. (Bercher Dep., 88:16-89:3). The cited language of the Shift Differential Policy requires management approval of shift differential pay and, therefore, grants management discretion to decide whether or not to seek to apply the Shift Differential Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 14, 16; PSF Exhibit 21, Tolsky Deposition Transcript ["Tolsky Dep."], 45:4-17; 152:12-22; Defs.' App'x. Exhibit 6, Excerpts from the Deposition Transcript of Jason Tolsky ["Dep. Tr. of Tolsky"], 172:10-19). In order to provide an employee with shift differential pay, managers must complete a PeopleSoft Employee Record Change (PERC) form and submit it to Human Resources. (Shift Differential Policy, Section 4.2). In addition, the PERC form requires Managing Director approval before a shift differential will be provided. (Shift Differential Policy, Section 4.2).

Defendants deny that all of their policies apply across the board to all of the CME Group employees. Defendants object to this assertion on the grounds that it represents the personal opinion of Francis and, therefore, the cited testimony is not admissible evidence. Moreover, Defendants deny that this assertion is fully supported by the cited materials.

Defendants admit that Tolsky testified that CME Group may have an overarching policy that applies to all divisions but departments or divisions may have their own practices with respect to how they operate under that policy. (Tolsky Dep., 141:23-143:11).

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

36. CME Group Shift Differential Policy expressly defines the scope of the applicability as follow:

> "All U.S. and international employees of the following CME Group Inc. companies, up to and including the level of Senior Director may be eligible to receive shift differential pay: Chicago Mercantile Exchange Inc., CME Group Clearing Europe, CME Operations Ltd., GFX Corporation, CBOT Market Data Services LLC and New York Mercantile Exchange, Inc. … Employees at or above the Executive Director level, Security Officers, and employees covered by a collective bargaining agreement are not eligible for shift differential pay. … Only those departments with jobs requiring continual coverage, as approved by management, during qualifying shifts may institute shift differential pay for their employees. Employees may be assigned to a qualifying shift and receive shift differential pay on a temporary or permanent basis. Employees may also work a qualifying shift, but not receive shift differential pay if the schedule is not required by business needs." (Ex. 1 Shift Differential Policy, Section 2.0 Scope)

**RESPONSE:** Undisputed.

37. CME Group Shift Differential Policy states the purpose of the policy as follows:

> "The purpose of CME Group's Shift Differential Policy is to provide additional compensation for employees who are required to work a second, third or non-standard shift due to a defined business need." (Ex. 1 Shift Differential Policy, Section 1.1 Purpose)

**RESPONSE:** Undisputed.

38. CME Group Shift Differential Policy provides the following definitions:

> "A shift differential is a premium applied to an employee's base

salary (exempt employees) or base hourly rate (non-exempt employees) to compensate them for working a qualifying shift to which they have been assigned. CME Group provides a flat 10% of base salary or base hourly rate as the shift differential pay to employees working a qualifying shift. For non-exempt employees, the adjusted base hourly rate will be used to calculate overtime pay and pay for benefit time taken." (Ex. 1 Shift Differential Policy, Section 3.1)

"Shifts qualifying for shift differential pay include: second shift, third shift or a non-standard shift."(Ex. 1 Shift Differential Policy, Section 3.2)

"… Second Shift - standard work day begins between 12:00 PM and 7:59 PM. Third Shift - standard work day begins between 8:00 PM and 3:59 AM. Non- Standard Shifts - standard workweek is Tuesday through Saturday (any shift), or Sunday through Thursday (any shift)." (Ex. 1 Shift Differential Policy, Section 3.3)

**RESPONSE:** Undisputed.

39. CME Group Shift Differential Policy provides the following ***PROCEDURE***:

"In order for an employee to qualify for shift differential pay, there must be a defined departmental business need to have the employee working the assigned shift. Employees working qualifying shifts as a result of the Flexible Work Arrangement Policy will not be eligible to receive shift differential pay. Likewise, employees choosing to work non-standard shifts for personal reasons will not qualify for shift differential pay." (Ex. 1 Shift Differential Policy, Section 4.1)

"To provide an employee with shift differential pay, managers must complete the PeopleSoft Employee Record Change (PERC) form and submit it to HR. The manager should include the employee's work hours on the form. Keep in mind that it is the manager's responsibility to ensure there is a defined business need for having the employee assigned to a qualifying shift. The PERC form providing an employee with shift differential pay requires MD approval."(Ex. 1 Shift Differential Policy, Section 4.2, emphasis added)

"It is the manager's responsibility to complete the PeopleSoft Employee Record Change (PERC) form and submit it to HR when an employee's schedule changes to a non-qualifying shift. At that time, the employee will no longer receive shift differential pay."

(Ex. 1 Shift Differential Policy, Section 4.3, emphasis added)

**RESPONSE:** Undisputed.

40.     PERC form is a simple form indicating an employee's status change. (See Ex. 9 PERC form example; Ex. 26 Bercher Dep. pp. 46-48)

**RESPONSE:** Partially disputed.  Defendants deny that this paragraph is fully supported by the cited materials, in two particular aspects: (a) Plaintiff's characterization of the form as "simple" is unsupported and inaccurate; and (b) the assertion that a PERC form represents an employee's "status change" rather than "record change" is unsupported and inaccurate.  (PSF Exhibit 9).

41.     CME Group Shift Differential Policy provided a contact number, which was the general HR phone number. (Ex. 1 Shift Differential Policy Section 5; Ex. 20 Francis Dep. p. 93)

**RESPONSE:** Undisputed.

42.     Once an employee works a qualifying shift, shift differential pay was automatically vested; therefore, managers were required to ensure that there is a need for the coverage of those qualifying shifts. (See Ex. 21 Tolsky Dep. p. 96; Ex. 26 Bercher Dep. p. 82; Ex. 11 Email Thread of Tolsky, Bercher, Wilson and Others in 2011; Ex. 12 Email Thread of Tolsky, Bearden and Briskey in 2012; Email Thread of Tolsky, Bercher and others in 2013)

**RESPONSE:** Disputed.  Defendants object to the legal conclusions and argument in this "fact".  To the extent the Court determines that this paragraph contains a proper statement of fact, rather than improper argument, Defendants deny that this paragraph is supported by the cited materials.  Defendants further deny that shift differential pay was ever "automatically vested" under the Policy.  Plaintiff's assertion has no basis in the deposition testimony, documents, or discovery responses in the record.  To the contrary, the record evidence *controverts* Plaintiff's unfounded assertion.  Tolsky, the author and Human Resources individual responsible for implementation and administration of the Shift Differential Policy, consistently

testified under oath that the Policy grants management discretion to decide whether or not to seek to apply the Shift Differential Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 10, 14; Tolsky Dep., 45:4-17; 152:12-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:10-19). The Policy itself makes no reference to shift differential pay being "automatically vested" but instead contains permissive language. (Shift Differential Policy, Section 2.0). Defendants admit that, pursuant to the Policy, if the manager intends to exercise discretion to provide a shift differential, then "it is the manager's responsibility to ensure there is a defined business need for having the employee assigned to a qualifying shift." (Shift Differential Policy, Section 4.2).

43.    Continual 24 hour coverage of the DC3 was a defined business need approved by HR for purposes of shift differential pay to DCE employees working at DC3. (Ex. 26 Bercher Dep. p. 65, 82)

**RESPONSE:**  Partially disputed.  Defendants deny that this paragraph is fully supported by the cited materials.  Defendants admit that the change to 12-hour shifts in DCE was made to accommodate the business need for 24-hour coverage at DC3.  (Bercher Dep., 65:6-10). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

44.    CME Group employees reasonably expected that they would receive shift differential pay pursuant to the policy when CME Group Shift Differential Policy was published. (See Ex. 26 Bercher Dep. pp. 81-82; Ex. 22 Walsh Dep. p. 10, 102, 105, 109, 156, 158, 168-69; Ex. 25 Holda Dep. pp. 123-130, 166,176, 214-15, 219; Ex. 24 Perez Dep. p. 64, 76, 91-93; Ex. 23 Pierce Dep. pp. 7, 68-72, 75, 99, 100-01, 105-06)

**RESPONSE:**  Disputed.  Defendants object to the legal conclusions and argument in this "fact".  To the extent the Court determines that this paragraph contains a proper statement of fact, rather than improper argument, Defendants deny that this paragraph is supported by the cited materials.  Plaintiff's assertion has no basis in the deposition testimony, documents, or

discovery responses in the record. To the contrary, the record evidence *controverts* Plaintiff's unfounded assertion. Defendants further deny that CME employees could reasonably expect to receive shift differential pay pursuant to the Shift Differential Policy after the Policy was published but before they were aware of it.

Bercher's cited testimony does not support the "fact" contained in this paragraph. Instead, when Becher was asked "If you were to look up a policy through OpenExchange, whether it be shift differential or a policy against discrimination . . . would you think that it would apply to all CME employees?", Bercher responded, "Yes." (Bercher Dep., 81:8-16). Defendants deny that Bercher's cited opinion testimony supports Plaintiff's implied assertion that CME employees would believe that *any* published Human Resources policy, regardless of what that policy says, would constitute a contractual offer to them. Defendants also deny that Bercher's opinion supports an assertion as to what "CME Group employees reasonably expected" and specifically deny that is supports an assertion regarding *Plaintiff's* reasonable expectation. Defendants further deny the existence of any reasonable expectation based on the permissive language in the Policy itself. (Shift Differential Policy, Section 2.0).

Defendants deny that Walsh, Holda, Perez, or Pierce expected to receive shift differential pay pursuant to CME Group's Shift Differential Policy. On the contrary, Walsh, Holda, Perez, and Pierce all testified that they did <u>not</u> expect to receive shift differential pay from CME, even after becoming aware of CME Group's Shift Differential Policy. (Walsh Dep., 90:2-20; Defendants' Appendix Of Exhibits In Support Of Their Response In Opposition To Plaintiff's Motion For Partial Summary Judgment ["Defs.' Opp. App'x."] Exhibit 1, Excerpts from the Deposition Transcript of Christopher Holda, 187:1-188:21; Perez Dep., 85:21-86:2; Defs.' Opp. App'x. Exhibit 2, Excerpts from the Deposition Transcript of Edmund Pierce, 92:17-20).

45.     At the DCE department, managed by Bercher, shift differential pay was administered as the CME Group Shift Differential Policy mandates, i.e. manager Bercher sought and obtained HR's clarification and approval before DCE employees were assigned to qualifying shifts. (See Ex. 11 Email Thread of Tolsky, Bercher, Wilson and Others in 2011; Ex. 13 Email Thread of Tolsky, Bercher and Others in 2013; Ex. 26 Bercher Dep. pp. 65, 73) Bercher requested for HR's prompt response but did not commence the qualifying shifts without the approval of those shifts from the HR. (See Ex. 11 Email Thread of Tolsky, Bercher, Wilson and Others in 2011, Bercher014)

**RESPONSE:**  Disputed.  Defendants object to the legal conclusions and argument in this "fact".  To the extent the Court determines that this paragraph contains a proper statement of fact, rather than improper argument, Defendants deny that this paragraph is fully supported by the cited materials.  Defendants admit that Bercher sought and obtained HR's approval to commence 12-hour shifts in the DCE, because the proposed schedule would result in certain employees receiving overtime pay one week and receiving less than forty hours of pay the next. (PSF Exhibit 11, at BERCHER_011).  As part of this process, Bercher sought clarification from Tolsky about which of DCE's 12-hour shifts qualify for a shift differential (noon to midnight, midnight to noon, or both).  (PSF Ex. 11, at BERCHER_014).  Defendants deny that the evidence supports the assertion that this was "as the CME Group Shift Differential Policy mandates".  Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

46.     Unlike DCE department, DCCI managers never sought approval from HR before they commenced the 24/7/365 coverage but they simply assigned DCCI employees to qualifying shifts without paying their shift differential pay pursuant to the policy. (See Ex. 3 DCCI Schedules; Ex. 28 Bearden Dep. pp. 23; Ex. 27 Petrowski Dep. p. 103)

**RESPONSE:**  Disputed.  Defendants object to the legal conclusions and argument in this "fact".  To the extent the Court determines that this paragraph contains a proper statement of fact, rather than improper argument, Defendants deny that this paragraph is supported by the cited materials.  Defendants further deny that the evidence supports the assertion that DCCI did

not follow the Shift Differential Policy. On the contrary, DCCI management exercised the discretion granted by the Policy to not seek to apply the Shift Differential Policy to employees working a qualifying shift.

When asked whether he "disagree[d] with" Section 3.2 of the Policy (which says: "Shifts qualifying for shift differential pay include: second shift, third shift or non-standard shift."), Bearden responded: "[T]hat's not the policy we followed. (Bearden Dep., 23:14-18). Tolsky, the author and Human Resources individual responsible for implementation of the Shift Differential Policy, testified that the Shift Differential Policy grants management discretion to decide whether or not to seek to apply the Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 10, 14; Tolsky Dep., 45:4-17; 152:12-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:10-19), and he accepted the decision made by DCCI management not to pay the DCCI employees a shift differential as allowable under the Policy. (Tolsky Decl., ¶¶ 21-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:20-24). In context, this testimony shows that the Policy *was* followed, *i.e.* the manager exercised permissible discretion not to utilize a pay differential rate.

Defendants deny Plaintiff's implied assertion that the DCE was somehow similarly situated to the DCE. DCE and DCCI had different department management and did not fall within the same one of CME's eight divisions. (Francis Dep., 20:1-10; Tolsky Dep., 63:3-6; Bercher Dep., 12:20-13:3, 23:15-22). The DCE employees worked 12-hour shifts, noon to midnight or midnight to noon. (Bercher Dep., 56:22-57:1). DCE employees rotated weekend coverage and were sometimes required to work holidays. (Bercher Dep., 39:6-15, 41:1-13). The DCCI, on the other hand, worked standard 8 or 8.5 hour shifts plus occasional overtime. (*See* PSF Exhibit 3; Petrowski Dep., 80:9-21). Certain employees worked standard Monday

through Friday schedules. (*See* PSF Ex. 3). Others were assigned to evening, overnight, or weekend coverage. (*See* PSF Ex. 3).

47. During and after the hiring process, Petrowski told the candidates and employees that it was a hard job and they would "work a lot of overtime and work nights, midnights or afternoons." (Ex. 27 Petrowski Dep. p. 80) No one mentioned anything about a shift differential pay during and immediately after the hiring process. (Ex. 27 Petrowski Dep. p. 85; Ex. 28 Bearden Dep. p. 29)

**RESPONSE:** Undisputed.

48. Walsh, Correa, and Pierce received a shift differential pay in their first paycheck. (See Ex. 28 Bearden Dep. pp. 54-56; Ex. 22 Walsh Dep. p. 42; Ex. 23 Pierce Dep. p. 21; Ex. 10 Email Thread of Bearden, Newman, and Wilson in 2011)

**RESPONSE:** Undisputed (though Defendants deny that this paragraph is fully supported by the cited materials).

49. Sometime between January 10 and 15 of 2011, when Walsh was looking at his first pay statement on the computer screen, a fellow employee walked by and said, "they better not be paying you a shift differential. Otherwise they owe me a lot of money" after he saw that Walsh had received a shift differential pay. (Ex. 22 Walsh Dep. pp. 58-59)

**RESPONSE:** Partially disputed. Defendants deny that this paragraph is fully supported by the cited materials. Defendants admit Walsh testified that, in the first week of his employment, he opened his PeopleSoft Human Resources profile and saw a notation stating that he was "second shift 10 percent shift differential". Plaintiff further testified that he showed one of his DCCI co-workers the notation. According to Plaintiff, the co-worker purportedly stated in response: "[T]hey better not be paying you a shift differential. Otherwise, they owe me a lot of money." (Walsh Dep., 58:18-59:11). Defendants deny that Walsh was looking at his first pay statement on his computer screen or that Walsh had received shift differential pay as of the date of this conversation.

50.    The next morning, Walsh talked to Petrowski about the incident and Petrowski told Walsh, "Don't worry. … There is a shift differential. There is a shift differential." (Ex. 22 Walsh Dep. p. 59) Walsh understood Petrowski's statement to mean that Petrowski was telling Walsh that he was entitled to shift differential pay. (Ex. 22 Walsh Dep. pp. 168-169)

**RESPONSE:**  Partially disputed.  Defendants deny that this paragraph is fully supported by the cited materials.  Defendants admit Walsh testified that, the next day, he approached Mr. Petrowski to tell him that a DCCI co-worker had seen the "second shift 10 percent shift differential" notation on Plaintiff's PeopleSoft Human Resources profile. Plaintiff purportedly stated to Mr. Petrowski: "I'm sorry that I let [the co-worker] see that." According to Plaintiff, Mr. Petrowski said in response: "[D]on't worry about what you did, Mike, that's fine. There is a shift differential. There is a shift differential."  (Walsh Dep., 59:12-60:13).  While Petrowski has no recollection of such a conversation with Plaintiff, Petrowski testified that if he had made the statement "There is a shift differential. There is a shift differential", he would have been acknowledging his awareness that that CME offered a shift differential to certain employees, and would not have intended to mean, or said, that there was a shift differential available to any of the DCCI employees, including Plaintiff.  (Petrowski Decl., ¶¶ 14-15).

Defendants further admit that Walsh testified that he understood Mr. Petrowski's words "There is a shift differential. There is a shift differential." to mean "that I'm getting the shift differential" (Walsh Dep., 168:11-14) but deny the truth of that testimony.  More important to the issue of summary judgment, Defendants deny that Walsh maintained any understanding that "there is a shift differential" after he saw that CME revoked the payment of shift differential from his first paycheck and that CME had ceased to provide him any additional shift differential payments – something Walsh admits had occurred within one or two months.  (Walsh Dep., 66:4-21).

51.     However, under Petrowski's instruction or approval, Bearden contacted Wilson at HRIS, data entry personnel within the HR, to change Walsh's shift status to non-qualifying first shift even though Walsh was not assigned to the first shift. (See Ex. 28 Bearden Dep. p.54; Ex. 10. Email Thread of Bearden, Newman, and Wilson in 2011; Ex. 20 Francis Dep. p. 144; Ex. 7. Walsh's Pay Adjustment Records)

**RESPONSE:** Undisputed (though Defendants deny that this paragraph is fully

supported by the cited materials).


52.     No one from the compensation or payroll was contacted about the issue. (See Ex.21 Tolsky Dep. p. 114, showing no recollection of the issue; Ex. 7 Walsh's Pay Adjustment Records showing no remarks other than those of HRIS and the miscalculation of the amount deducted; and non-existence of any documents showing any other communications)

**RESPONSE:** Disputed. *See* Defendants' response to paragraph 51, above.  Further,

someone from compensation or payroll must have been contacted about the issue, because the

subsequent deduction of the overpayment could not have occurred without such contact having

occurred.  (PSF Exhibit 7, at CME000005-000006).  Defendants admit that no evidence has been

found as to the details of the recoupment of the overpayment beyond as stated in paragraph 51.


53.     On Walsh's second pay statement, Walsh's shift status was changed to non-qualifying first shift even though he was assigned to and worked a second shift, and the regular pay portion of the previously paid shift differential pay was deducted but the overtime pay portion of the paid shift differential pay remained. (Ex. 7 Walsh's Pay Adjustment Records; Ex. 3 DCCI Schedules)

**RESPONSE:** Partially disputed.  Defendants admit that Plaintiff was assigned to and

worked the afternoon shift in January and February 2011.  (PSF Ex. 3).  Defendants admit that

Plaintiff's shift status was changed to first shift with the notation "No Shift Diff" on his New

Hire Status Form on January 28, 2011.  (PSF Ex. 7, at CME000002-000003).  Defendants further

admit that, on Plaintiff's second Earnings Statement, for the period ending January 29, 2011, the

regular pay portion of the previously paid shift differential pay was deducted but the overtime

pay portion of the paid shift differential pay remained – a $7.65 benefit to Walsh.  (PSF Ex. 7, at

CME000005-000006).  Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

54.     After Walsh realized that he no longer received shift differential pay, he asked the DCE employees at the data center, namely, Nowak, Yelensky, Fann, and Garza, if they were getting shift differential pay. They all answered that they were receiving shift differential pay. (Ex. 22 Walsh Dep. pp. 66-67)

**RESPONSE:** Undisputed (though the alleged statements of Nowak, Yelensky, Fann, and Garza are inadmissible hearsay and can be taken as true solely for the purpose of Plaintiff's Motion).  However, Defendants object to the vagueness of the time frame in this paragraph. Walsh testified that he did not realize that the shift differential payment had been clawed back for "a month to two months".  (Walsh Dep., 66:4-21).  Plaintiff contends that DCE at DC3 started operating on a 24/7/365 basis around November 2011 and that Bercher did not commence qualifying shifts without the approval of those shifts from Human Resources around 2011.  (PSF ¶¶ 22, 45).  Thus, it is unclear from this paragraph when Plaintiff purportedly asked the DCE employees if they were receiving shift differential pay.

55.     Walsh asked Bearden and then Briskey about the issue. Both of them told Walsh to "drop it," not to bring it up again, "don't let Bob [Petrowski] hear about it," "don't piss off Bob [Petrowski]" or that Petrowski would get mad if he hears about it. (Ex. 22 Walsh Dep. pp. 72-75)

**RESPONSE:** Disputed.  Bearden testified that did not remember having a conversation with Walsh about shift differential.  (Bearden Dep., 42:3-12).  Briskey testified that the first time that he ever heard of shift differential pay was around March 2016 and denied that he ever had a conversation with Walsh about shift differential.  (Briskey Dep., 37:4-14, 52:21-23).

56.     Around late spring, early summer of 2011, Holda told Briskey that he would ask Petrowski about shift differential pay. Briskey told Holda "I wouldn't do it if I were you" (Ex. 25 Holda Dep. pp. 30, 116-117)

**RESPONSE:**  Disputed.  Defendants deny that this paragraph is fully supported by the cited materials.   While Briskey was not asked during his deposition about this purported conversation with Holda, Briskey testified that the first time that he ever heard of shift differential pay was around March 2016.  (Briskey Dep., 37:4-14).

57.   In July, 2012, Director of Compensation Jason Tolsky ("Tolsky") sent an email to Bearden and Briskey and asked if any of the DCCI employees were working qualifying shifts because records showed that none of the DCCI employees were receiving shift differential pay. (Ex. 12 Email Thread of Tolsky, Bearden, and Briskey in 2012)

**RESPONSE:**  Undisputed.

58.   Tolsky contacted Bearden and Briskey instead of Petrowski, because employees reported directly to their direct line managers (Ex. 21 Tolsky Dep. p. 130) showing that as long as an employee works a qualifying shift, shift differential pay is vested and therefore Tolsky sought information about the DCCI employees' actual shifts worked through their direct line managers. Bearden asked Tolsky to call him. (Ex. 12 Email Thread of Tolsky, Bearden and Briskey in 2012) Briskey testified that he does not know who Tolsky is and did not read the email from Tolsky even though he might have glanced through it. (Ex. 29 Briskey Dep. pp. 48, 141-147)

**RESPONSE:**  Partially disputed.   Defendants object to the legal conclusions and argument in this "fact".  To the extent the Court determines that this paragraph contains a proper statement of fact, rather than improper argument, Defendants deny that this paragraph is fully supported by the cited materials.

Defendants admit that Tolsky testified that he contacted Bearden and Briskey because the DCCI employees reported directly to them, and Petrowski was in a higher level position over Bearden and Briskey.  (Tolsky Dep., 130:4-12).  Defendants deny that it logically follows from this that "as long as an employee works a qualifying shift, shift differential pay is vested." Defendants deny that shift differential pay was ever "vested" under the Policy.  Plaintiff has failed to cite to any materials to support this assertion and it has no basis in the deposition testimony, documents, or discovery responses in the record.  To the contrary, the record evidence

*controverts* Plaintiff's unfounded assertion. The Policy itself does not state that shift differential pay vests, but rather, it contains permissive language. (Shift Differential Policy, Section 2.0). Further, Tolsky, the author and Human Resources individual responsible for implementation and administration of the Shift Differential Policy, consistently testified under oath that the Policy grants management discretion to decide whether or not to seek to apply the Shift Differential Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 10, 14; Tolsky Dep., 45:4-17; 152:12-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:10-19).

Defendants admit that Bearden asked Tolsky to "call [his] cell". (PSF Exhibit 12). Defendants also admit that Briskey testified that he does not know who Tolsky is and did not recall receiving an email from Tolsky in July 2012 (Briskey Dep., 48:13-14, 141:3-14). However, Briskey testified that when an email was sent to both Bearden and Briskey, Briskey would defer to Bearden as the more senior member of management as a matter of professional courtesy and would not read it in depth or dive into the matter unless directed to do so by Petrowski or Bearden. (Briskey Dep., 141:19-145:3, 147:18-24). Once Briskey saw a response from Bearden to Tolsky, he knew Bearden had addressed the issue. (Briskey Dep., 144:2-145:3, 146:23-24, 147:10-12).

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

59. Sometime in 2012 or 2013, Bercher came to DCCI's office and asked Bertha Perez about filling out the PERC forms for shift differential pay in the presence of Walsh and Correa. When Bertha Perez, Walsh and Correa indicated that DCCI employees do not receive shift differential pay, Bercher said that he "couldn't believe Bob [Petrowski] was doing that," "he's trying to make his budget look better" and that "Bob [Petrowski] would get in a lot of trouble for that." (Ex. 22 Walsh Dep. pp. 78-80)

**RESPONSE:** Partially disputed. Defendants deny that this paragraph is fully supported by the cited materials. The assertions in this paragraph regarding Bercher's purported

statements, as reported by Walsh, are not fully supported by the deposition testimony. The deposition testimony indicates that, according to Walsh, sometime in 2012 or 2013, Bercher came to the DCCI office and told Bertha Perez that Bercher "gets paranoid about filling out the PERC forms [and] wants to make sure that . . . when his employees switch shifts, he needs to switch their pay, so they receive the differential." (Walsh Dep., 77:23-78:7). Defendants further admit that, according to Walsh, Bercher said to Perez, "don't you guys do that", to which Perez responded, "no, we don't do that." (Walsh Dep., 78:9-11). Again, according to Walsh, both he and Correa told Perez and Bercher that Walsh and Correa had received shift differential on their first paychecks and then it was taken away afterwards. (Walsh Dep., 78:11-17). Walsh purportedly saw Bercher walking outside after this conversation and according to Walsh, Bercher said "he couldn't believe Bob was [] not paying the shift differential" and Bob was "trying to make his budget look better" and could "get in a lot of trouble for that". (Walsh Dep., 80:9-21). However, Bercher testified that no one on the DCE team changed shifts. (Bercher Dep., 83:18-84:3). From that testimony, it follows that Bercher would not have been "filling out the PERC forms for shift differential pay" in 2012 or 2013 because the DCE employees would not have been moving on and off qualifying shifts. Bercher further testified that he was present for a group conversation where one of the DCCI employees, maybe Walsh, asked Bertha Perez if the DCCI employees were supposed to receive shift differential pay. (Bercher Dep., 85:23-86:13). The remaining assertions of this paragraph are inadmissible personal opinions of Bercher, and do not constitute facts to which he can attest. Moreover, they are inconsistent with his own testimony that no one in CME management or Human Resources ever told Bercher that payment of a shift differential is mandatory under any circumstances (Bercher Dep., 87:13-88:23), and with other evidence in the record that employee salaries are not included in the

budgets created by department managers. (Petrowski Dep., 119:22-120:1, 122:2-11). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

60. Sometime around 2015, Gautier showed Holda CME Group Shift Differential Policy and told him that the policy had been posted on the company's website. (Ex. 25 Holda Dep. pp. 123-124)

**RESPONSE:** Partially disputed. Defendants admit that, according to Holda, Paul Gautier pulled up the Shift Differential Policy on his work computer and told Holda that the Shift Differential Policy was posted on OpenExchange. (Holda Dep., 123:14-125:6). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

61. At DCCI, Petrowski had been using shift assignments as either an award or a punishment. Third shift was called the midnight shift but also the "graveyard shift" or a "crappy shift" and was not preferred by the employees. (See Ex. 25 Holda Dep. pp. 149, 167; Ex. 24 Perez Dep. pp. 89) Petrowski assigned Walsh to third shift for eight months straight when Walsh was on his "shit list." (Ex. 22 Walsh Dep. p. 182; Ex. 25 Holda Dep. pp.149-152) Gautier was known to be retaliated against for raising the shift differential issue and put on third shift for a long time. (Ex. 24 Perez Dep. pp. 88-89)

**RESPONSE:** Disputed. Defendants deny that this paragraph is fully supported by the cited materials. Plaintiff has failed to cite to any materials to support the first sentence of this paragraph. The assertion that Gautier was "known" to be retaliated against is speculation, not admissible testimony. The remaining assertions of this paragraph are inadmissible personal opinions of Plaintiff, Holda and Perez, and do not constitute facts to which they can attest.

62. On the other hand, those who had been working with Petrowski for a long time were assigned to first shift for their "seniority" even though new employees needed to be on first shift more to be trained. (Ex. 28 Bearden Dep. pp. 39-40; but see Ex. 25 Holda Dep. pp. 47-48, 150)

**RESPONSE:** Partially disputed. Defendants admit that, according to Bearden, the employees who worked first shift were typically the individuals who had a skill set or who had worked first shift prior to the 2010 and 2011 hiring in DCCI. (Bearden Dep., 39:16-18). Defendants further admit that, according to Holda, the new hires initially worked first shift for training. (Holda Dep., 150:1-11). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

63. DCCI followed all of CME Group policies, including the overtime policy, but not the shift differential policy. (See Ex. 28 Bearden Dep. pp. 23, 68-70)

**RESPONSE:** Partially disputed. Defendants object to the legal conclusions and argument in this "fact". Defendants deny that the evidence supports the assertion that DCCI did not follow the Shift Differential Policy. On the contrary, DCCI management exercised the discretion granted by the Policy not to seek to apply the Shift Differential Policy to employees working a qualifying shift.

When asked whether he "disagree[d] with" Section 3.2 of the Policy (which says: "Shifts qualifying for shift differential pay include: second shift, third shift or non-standard shift."), Bearden responded: "[T]hat's not the policy we followed. (Bearden Dep., 23:14-18). Tolsky, the author and Human Resources individual responsible for implementation of the Shift Differential Policy, testified that the Shift Differential Policy grants management discretion to decide whether or not to seek to apply the Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 10, 14; Tolsky Dep., 45:4-17; 152:12-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:10-19), and he accepted the decision made by DCCI management not to pay the DCCI employees a shift differential as allowable under the Policy. (Tolsky Decl., ¶¶ 21-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:20-24). In context, this testimony shows that the

Policy *was* followed, *i.e.* the manager exercised permissible discretion not to utilize a pay differential rate.

Moreover, to the extent Plaintiff attempts to draw a comparison between the Shift Differential Policy and other CME Group policies, including the overtime policy, Plaintiff has failed to cite to any materials to support this assertion. Plaintiff does not cite to any other CME Group policy, let alone explain whether that particular policy contains limits on scope or permissive language. Without such evidence, Plaintiff cannot support his comparison.

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

64. After Walsh saw CME Group Shift Differential Policy, he contacted the HR and talked to Senior Director of Employee Relations Liz Francis ("Francis") around April, 2014 (Ex. 22 Walsh Dep. pp. 84; Ex. 20 Francis Dep. p. 32) However, Francis informed Walsh that he was not entitled to shift differential pay based on her conversation with Tolsky. (Ex. 20 Francis Dep. pp. 41-42, 51) Even though Tolsky thought Walsh's shift differential pay was waived during the hiring process, the recruiter had been simply informed by Bearden that DCCI employees did not receive shift differential pay. (See Ex. 14 Email Thread of Tolsky, Francis and Myszka in 2014; Plaintiff's SOF 53-54, 60)

**RESPONSE:** Partially disputed. Defendants object to the vagueness of the time frame in this paragraph. Plaintiff testified that he "happened to see" the Shift Differential Policy for the first time in late 2013, but Plaintiff did not contact Francis until April 2014. (Walsh Dep., 85:14-86:8, 91:5-14). Therefore, while Walsh contacted Human Resources "after" he saw the policy, it was several months after. Defendants agree that when Walsh contacted Human Resources, Walsh was informed that he was not entitled to shift differential pay, and that similar information was communicated to Walsh during the hiring process. Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

65.     Walsh asked Bearden again in early 2014 about the shift differential policy. (Ex. 22 Walsh Dep. p. 97) In response, Bearden told Walsh to put 8.5 hours instead of 8 hours a day instead of claiming shift differential pay. (Ex. 22 Walsh Dep. p. 98) However, day shift employees at DC3 had been putting 8.5 hours a shift since July, 2011 and since December, 2011, all DCCI employees had been assigned to and putting an 8.5 hour shift already. (Ex. 3 DCCI Schedules)

**RESPONSE:**   Disputed.   Defendants deny that Walsh asked Bearden in early 2014 about shift differential.   (Bearden Dep. 42:3-19).   From that denial, it follows that the remaining assertions about any such conversation, such as the assertion that Walsh put down 8.5 hours "instead of claiming shift differential pay," are denied by Bearden.   Defendants admit that morning shift employees at DC3 had been assigned to work 8.5 hour shifts since July 2011 and, since December 2011, all DCCI employees had been assigned to work 8.5 hour shifts.   (PSF Ex. 3, at CME000298-300, CME000305-306).   Defendants deny that the cited evidence supports the assertion that DCCI employees were "putting" 8.5 hours a shift.   Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

66.     Walsh asked Briskey about the shift differential policy multiple times but Briskey always told him not to bring it up. (Ex. 22 Walsh Dep. pp. 98-100)

**RESPONSE:**   Disputed.   Briskey testified that the first time that he ever heard of shift differential pay was around March 2016 and denied that he ever had a conversation with Walsh about shift differential.   (Briskey Dep., 37:4-14, 52:21-23).

67.     Around February and March, 2016, DCCI employees discussed CME Group Shift Differential policy as a group since DCCI was going to be sold to CyrusOne. (Ex. 22 Walsh Dep. pp. 104-105)

**RESPONSE:**   Partially disputed.   Defendants admit that DC3 was sold to CyrusOne as of March 31, 2016.   (Francis Decl., ¶¶ 12-13, 26-27).   Defendants deny any additional or

contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

68.     Sometime around 2016, when Pierce asked Bercher and Nowak at DCE, both of them told Pierce that DCE employees receive shift differential pay and Bercher stated that DCCI employees qualified for it. (Ex. 23 Pierce Dep. pp. 77-79) Pierce concluded that DCCI employees were entitled to shift differential pay based on CME Group Shift Differential Policy and his conversation with Bercher. (Ex. 23 Pierce Dep. pp. 100, 105-106)

**RESPONSE:** Disputed.   Defendants object to this paragraph on the grounds that (a) Bercher's purported statements are hearsay and inconsistent with his deposition testimony (Bercher Dep., 84:4-9, 85:18-22) and (b) it includes the personal opinions of Bercher and Pierce and, therefore, the cited testimony is not admissible evidence.

69.     Perez also talked to Bercher and a DCE employee about shift differential pay and looked up CME Group Shift Differential Policy after discovering that DCE employees were receiving shift differential pay. (Ex. 24 Perez Dep. pp. 63-68)

**RESPONSE:** Undisputed.

70.     On March 10, 2016, Francis hosted two meetings at DC3 to discuss the severance packages for DCCI employees. (Ex. 20 Francis Dep. pp. 56-57, 60) During the meetings, DCCI employees raised the shift differential issues with Francis and Francis advised them that she would look into it. (Ex. 20 Francis Dep. pp. 66)

**RESPONSE:** Partially disputed.   Defendants admit that, on March 10, 2016, Ms. Francis held two meetings at DC3 to speak with the non-exempt DCCI employees about the transition to CyrusOne.   (Francis Decl., ¶¶ 12-14; Francis Dep., 54:14-23, 56:15-24, 57:5-11). During one of her meetings at DC3, one employee raised the issue of shift differential pay. (Francis Decl., ¶ 16; Francis Dep., 63:4-15, 68:14).   Ms. Francis told the DCCI employees that she would look into the issue and get back to them.   (Francis Decl., ¶¶ 17-18; Francis Dep., 66:2-9).   Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

71.     After Francis told the DCCI employees that she would look into the matter, Francis emailed Petrowski and told him not to say anything to DCCI employees on March 10, 2016. (Ex. 15 Email between Francis and Petrowski in 2016)

**RESPONSE:** Undisputed.


72.     Francis reported the matter to the managing director of human resources Mike Crawshaw and HR concluded the matter by deciding to inform the DCCI employees that shift differential pay was "baked in" to their base salary. (See Ex. 19 Excerpts from the defendants' discovery responses; Ex. 16 Emails and Reports by Francis re shift differential issue raised by DCCI employees in 2016)

**RESPONSE:** Partially disputed.  Defendants admit that Francis forwarded her March 24, 2016 email response to the non-exempt DCCI employees to Mike Crawshaw "just as an FYI." (PSF Exhibit 16, at CME000622).  Defendants further admit that Francis told the non-exempt DCCI employees, including Walsh, that they were not eligible to receive shift differential pay under the Shift Differential Policy based on a decision made by DCCI management.  (PSF Exhibit 17, at CME000639-640).  Defendants agree that a reason that DCCI employees did not receive shift differential pay was that their base pay took into consideration the fact that they would be rotating shifts for 24/7 coverage of the DCCI, *i.e.* it was "baked into" their base rate, and this was communicated to the new DCCI employees, including Plaintiff. (Petrowski Decl., ¶ 12; Petrowski Dep., 249:4-19; Bearden Dep., 23:24-24:7, 36:18-23). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.


73.     Francis responded to DCCI employees by email. (See Ex. 17 Emails between Francis and DCCI employees in 2016)

**RESPONSE:** Undisputed.


74.     When Walsh saw Francis' response, he thought it was a lie because no one ever told him that he was being paid in lieu of a shift differential. (Ex. 22 Walsh Dep. pp. 108-109)

**RESPONSE:** Disputed. While Plaintiff testified that "no one ever told [him that he] was… being paid in lieu of a shift differential" (Walsh Dep., 109:1-3), Plaintiff's statement is inconsistent with his own earlier testimony and conflicts with the undisputed facts in the record. In April 2014, when Plaintiff asked Francis whether he should be receiving shift differential pay pursuant to the Shift Differential Policy (Walsh Dep., 91:5-14; Francis Decl., ¶ 4), Francis told Plaintiff that certain departments, including the DCCI, did not pay the shift differential to employees working off-shift. (Francis Decl., ¶¶ 8-9, Ex. B; Walsh Dep., at 94:6-24). She further explained that the departments that do not pay shift differential include consideration for the working hours when determining employee salaries. (Francis Decl., Ex. B). Thus, in April 2014, Plaintiff was told by Francis that he "was . . . being paid in lieu of a shift differential." Defendants further deny the assertion that Walsh genuinely thought that this explanation was a lie, given that he had never been told anything inconsistent with this explanation, and Defendants dispute that any opinion Walsh had regarding the truth of the reason given is admissible evidence.

75.    Petrowski has no input in setting DCCI employees' salary ranges (Ex. 27 Petrowski Dep. p. 113) and does not participate in setting policies related to compensation (Ex. 27 Petrowski Dep. p. 237).

**RESPONSE:** Partially disputed. Defendants deny that the evidence supports the assertion that Petrowski has no input in setting DCCI salary ranges. Petrowski testified that, in 2010 and 2011, he worked with Bearden and the Human Resources Department to set a starting hourly rate for the new DCCI employees to be hired. (Petrowski Dep., 248:13-249:19). Defendants deny that the assertion that Petrowski does not participate in setting policies related to compensation is supported by the cited evidence but admit that Petrowski does not participate in setting Human Resources policies related to compensation.

76. Petrowski testified that he had not seen CME Group Shift Differential Policy until Walsh's deposition in November, 2016 (Ex. 27 Petrowski Dep. pp. 96-97) and none of the DCCI employees worked for him (Ex. 27 Petrowski Dep. pp. 176-177) Holda testified that it would make absolutely no sense if Petrowski had not known about the shift differential policy because he was CME Group's chief building engineer. (Ex. 25 Holda Dep. pp. 233-234) Francis testified that CME Group Shift Differential Policy appears on the website and does not need to be searched. (Ex. 20 Francis Dep. pp. 37-38)

**RESPONSE:** Partially disputed. Defendants object to this paragraph on the grounds that it (a) improperly includes multiple, unrelated facts in one paragraph, and (b) includes the personal opinion of Holda and, therefore, the cited testimony is not admissible evidence. Defendants admit that Petrowski testified that he had not seen the Shift Differential Policy until Plaintiff's deposition in November 2016. (Petrowski Dep., 96:24-97:4). Defendants deny that "none of the DCCI employees worked for [Petrowski]". On the contrary, Bearden and Briskey directly reported to Petrowski. (Petrowski Decl., ¶ 7). The non-exempt DCCI employees directly reported to Bearden or Briskey and, consequently, indirectly worked for Petrowski. (Tolsky Dep., 130:10-11; Petrowski Dep., 195:11-196:16). Defendants deny that this paragraph accurately reflects Francis's testimony, in which she explained that "[t]here is a tab for policies and procedures on the home page" of OpenExchange, which links to a list of all the CME Group policies in alphabetical order. (Francis Dep., 37:16-20, 38:16-20). Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

77. Briskey also testified that he had not heard of CME Group Shift Differential Policy until March, 2016. (Ex. 29 Briskey Dep. p. 37)

**RESPONSE:** Undisputed.

78. Bearden testified that he reports everything to Petrowski (Ex. 28 Bearden Dep. p. 60), that Petrowski would have the power to cause the removal of the shift differential pay made to Walsh and Correa (Ex. 28 Bearden Dep. p. 54) and that even though DCCI followed all other CME Group policies, DCCI did not follow the CME Group's shift differential policy (Ex. 28

Bearden Dep. p. 23) and he thought that he may have had conversations with Petrowski about why DCCI did not follow the shift differential policy. (Ex. 28 Bearden Dep. p. 25)

**RESPONSE:** Disputed. Defendants object to this paragraph on the grounds that it represents Bearden's personal opinion and speculation about Petrowski's authority with respect to shift differential pay and, therefore, the cited testimony is not admissible evidence. Defendants deny that the evidence supports the assertion that DCCI did not follow the Shift Differential Policy. On the contrary, DCCI management exercised the discretion granted by the Policy not to seek to apply the Shift Differential Policy to employees working a qualifying shift. When asked whether he "disagree[d] with" Section 3.2 of the Policy (which says: "Shifts qualifying for shift differential pay include: second shift, third shift or non-standard shift."), Bearden responded: "[T]hat's not the policy we followed. (Bearden Dep., 23:14-18). Tolsky, the author and Human Resources individual responsible for implementation of the Shift Differential Policy, testified that the Shift Differential Policy grants management discretion to decide whether or not to seek to apply the Policy to employees working a qualifying shift. (Tolsky Decl., ¶¶ 10, 14; Tolsky Dep., 45:4-17; 152:12-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:10-19), and he accepted the decision made by DCCI management not to pay the DCCI employees a shift differential as allowable under the Policy. (Tolsky Decl., ¶¶ 21-22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:20-24). In context, this testimony shows that the Policy *was* followed, *i.e.* the manager exercised permissible discretion not to utilize a pay differential rate. Defendants deny that Bearden testified that he thought he may have had conversations with Petrowski "about why DCCI did not follow the shift differential policy." (Bearden Dep., 25:21-26:5).

Moreover, to the extent Plaintiff attempts to draw a comparison between the Shift Differential Policy and other CME Group policies, including the overtime policy, Plaintiff has

failed to cite to any materials to support this assertion. Plaintiff does not cite to any other CME Group policy, let alone explain whether that particular policy contains limits on scope or permissive language. Without such evidence, Plaintiff cannot support his comparison.

Defendants deny any additional or contrary assertions of this paragraph, and deny that any such additional or contrary assertions are supported by the cited materials.

### DEFENDANTS' LOCAL RULE 56.1(b)(3)(C) STATEMENT OF ADDITIONAL FACTS[3]

1.     Walsh, Holda, Perez, and Pierce all testified that they did not expect to receive shift differential pay from CME, even after becoming aware of CME Group's Shift Differential Policy. (Defs.' App'x. Exhibit 1, Excerpts from the Deposition Transcript of Michael Walsh ["Dep. Tr. of Walsh"], 90:2-20; Defs.' Opp. App'x. Exhibit 1, Excerpts from the Deposition Transcript of Christopher Holda, 187:1-188:21; Perez Dep., 85:21-86:2; Defs.' Opp. App'x. Exhibit 2, Excerpts from the Deposition Transcript of Edmund Pierce, 92:17-20).

2.     Plaintiff did not respond in any way to Francis's April 22, 2014 email telling Plaintiff that certain departments, including the DCCI, did not pay the shift differential to employees working off-shift. (Francis Decl., ¶¶ 8-11).

DSF ¶ 24.     At all times, Plaintiff was employed as an at-will employee of CME. (Defs.' App'x. Exhibit 2, Walsh Dep. Exhibits, Exhibit 1; Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 38:10-15).

DSF ¶ 31.     The next day, Plaintiff allegedly approached Mr. Petrowski to tell him that

---

[3] Defendants cite twenty-two paragraphs from their Local Rule 56.1 Statement Of Undisputed Material Facts [Doc. No. 39] in their Response In Opposition To Plaintiff's Motion For Partial Summary Judgment. Defendants incorporate these twenty-two paragraphs into their Local Rule 56.1(b)(3)(C) statement of "any additional facts that require the denial of summary judgment" but retain the same numbering ["DSF ¶ __"] for the sake of clarity in the context of the parties' cross-motions for summary judgment.

a DCCI co-worker had seen the "second shift 10 percent shift differential" notation on Plaintiff's PeopleSoft Human Resources profile.[4]  Plaintiff purportedly stated to Mr. Petrowski: "I'm sorry that I let [the co-worker] see that."   According to Plaintiff, Mr. Petrowski said in response: "[D]on't worry about what you did, Mike, that's fine. There is a shift differential. There is a shift differential."  Plaintiff alleged replied: "[O]kay, sorry about that" and the conversation ended. Mr. Petrowski did not say anything else to Plaintiff about a shift differential during this purported conversation or at any other time during Plaintiff's employment with CME.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 59:12-60:13, 62:10-24, 77:1-10, 96:24-97:14, 104:4-6).

DSF ¶ 34.    By April 2011, Plaintiff realized the payment had been clawed back, and as of that time, he never again expected to receive a shift differential from CME.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 77:1-14, 90:2-20, 95:11-17, 96:11-15).

DSF ¶ 38.    Plaintiff admits that no one in CME management or Human Resources ever told him that he was entitled to receive a shift differential pursuant to CME's unwritten shift differential practice.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 165:15-19).

DSF ¶ 40.    Jason Tolsky is the author of CME Group's Shift Differential Policy.  In his position as Director, Compensation, and later Senior Director, Compensation, he was responsible for the implementation and administration of the Policy.  (Tolsky Decl., ¶¶ 2, 10).

DSF ¶ 43.    The Shift Differential Policy grants management discretion to decide whether or not to seek to apply the Shift Differential Policy to employees working a qualifying shift.  (Tolsky Decl., ¶ 14; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 45:4-17; 152:12-22, 172:10-19).

---

[4] Petrowski has no recollection of such a conversation with Plaintiff.  (Petrowski Decl., ¶ 15; Petrowski Dep., 86:9-19).  However, Plaintiff's version of the facts can be accepted as true for purposes of the parties' cross-motions for summary judgment.

DSF ¶ 45.     The Shift Differential Policy requires management approval in order to pay shift differential pay to an employee.  (Tolsky Decl., ¶ 16).

DSF ¶ 46.     Section 4.2 of the Policy specifies that, in order to provide an employee with shift differential pay, managers must complete a PeopleSoft Employee Record Change (PERC) form and submit it to Human Resources.  "The PERC form providing an employee with shift differential pay requires [Managing Director] approval."  (Tolsky Decl. ¶ 17, Ex. A).

DSF ¶ 47.     CME never intended for shift differential pay under the Shift Differential Policy to be mandatory.  Instead, CME intended to make shift differential pay available to certain employees upon the discretion of their managers. This is why the Policy states that employees "**may** be eligible to receive shift differential pay" and departments "**may** institute shift differential pay for their employees." (Tolsky Decl., ¶ 18).

DSF ¶ 48.     A link to the Shift Differential Policy was created under the "Human Resources Policies" tab on OpenExchange, CME's employee intranet.  This is the only place where the Shift Differential Policy was made publicly available to CME employees.  (Tolsky Decl., ¶ 19).

DSF ¶ 51.     Mr. Tolsky accepted the decision made by DCCI management as allowable under CME Group's Shift Differential Policy.  (Tolsky Decl., ¶ 22; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 172:20-24).

DSF ¶ 53.     Thus, neither Plaintiff nor any of the other DCCI employees was entitled to receive a shift differential pursuant to CME Group's Shift Differential Policy.  (Tolsky Decl., ¶ 23; Defs.' App'x. Ex. 6, Dep. Tr. of Tolsky, 45:8-17, 172:10-19).

DSF ¶ 54.     Plaintiff testified that, at some point in late 2013, he was looking at the Human Resources policies on the intranet (OpenExchange) and "happened to see" the Shift

Differential Policy for the first time.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 85:14-86:8).

DSF ¶ 56.    Plaintiff admits that, even after he saw the Policy for the first time in late 2013, "[he] knew [he] wouldn't" receive a shift differential in any of his future paychecks. (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 90:2-20).

DSF ¶ 57.    On April 21, 2014, Plaintiff called Liz Francis, Senior Director, Employee Relations, to ask whether he should be receiving shift differential pay pursuant to CME Group's Shift Differential Policy.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 91:5-14; Francis Decl., ¶¶ 2, 4).

DSF ¶ 60.    After communicating with Mr. Tolsky, Ms. Francis told Plaintiff that certain departments, including the DCCI, did not pay the shift differential to employees working off-shift.  (Francis Decl., ¶ 8; Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 94:6-24).

DSF ¶ 63.    During one of her meetings at DC3, one employee raised the issue of shift differential pay.  (Francis Decl., ¶ 16; Defs.' App'x. Exhibit 8, Excerpts from the Deposition Transcript of Elizabeth Francis ["Dep. Tr. of Francis"], 63:4-15, 68:14).

DSF ¶ 64.    Eventually, all of the remaining DCCI employees told Ms. Francis that they had the same issue and each one contacted her directly about their individual situations. (Francis Decl., ¶ 17; Defs.' App'x. Ex. 6, Dep. Tr. of Francis, 68:8-11).

DSF ¶ 69.    On March 24, 2016, Ms. Francis told the non-exempt DCCI employees, including Plaintiff, that they were not eligible to receive shift differential pay under the Shift Differential Policy based on a decision made by DCCI management.  (Francis Decl., ¶¶ 22-23).

DSF ¶ 70.    In her individual response to Plaintiff, Ms. Francis also reminded him that he became aware that he would not receive shift differential pay shortly after he was hired in January 2011 when he was erroneously paid a shift differential and that pay was clawed back.

(Francis Decl., ¶ 24; Francis Decl., Ex. C).

DSF ¶ 71.    Plaintiff admits that no one in CME management or Human Resources ever told him that he was entitled to receive shift differential pay pursuant to CME Group's Shift Differential Policy.  (Defs.' App'x. Ex. 1, Dep. Tr. of Walsh, 165:15-19).

DSF ¶ 74.    Plaintiff filed his Complaint against Defendants on June 15, 2016.  (Doc. No. 1, Complaint).

Dated:  June 12, 2017

Respectfully submitted,

CHICAGO MERCANTILE EXCHANGE INC., and CME GROUP INC.,


 /s/ Stephanie L. Mills-Gallan
                    *One of Their Attorneys*

David K. Haase (ARDC# 6201278)
Stephanie L. Mills-Gallan (ARDC #6313506)
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL  60654
Telephone: (312) 372-5520
Facsimile: (312) 372-7880
*dhaase@littler.com*
*smillsgallan@littler.com*

## CERTIFICATE OF SERVICE

I, Stephanie L. Mills-Gallan, an attorney, certify that on June 12, 2017, I electronically filed **Defendants' Local Rule 56.1(b)(3) Response To Plaintiff's 56.1(a)(3) Statement Of Undisputed Facts And Defendants' Local Rule 56.1(b)(3)(C) Statement Of Additional Facts** via the CM/ECF filing system with the United States District Court for the Northern District of Illinois, and that the following CM/ECF participants were served with a copy of same through the CM/ECF filing system:

Samuel Shim
Hyo Jung Kim
LAW OFFICES OF SAMUEL SHIM
3501 Algonquin Road, Suite 600
Rolling Meadows, IL 60008
*sshim.law@gmail.com*
*rosabaekim.esq@gmail.com*

*/s/ Stephanie L. Mills-Gallan*
Stephanie L. Mills-Gallan

Firmwide:147763800.4 059775.1026