IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **MICHAEL WALSH**, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**CHICAGO MERCANTILE EXCHANGE, INC.,** and **CME GROUP, INC.,**<br><br>Defendants. | No. 16-cv-6224<br><br>Honorable Judge Manish Shah<br><br>Magistrate Judge Jeffrey T. Gilbert |

**DEFENDANTS' REPLY IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT**

Plaintiff's Memorandum Of Law In Opposition To Defendants' Motion For Summary Judgment [Doc. No. 53] ("Plaintiff's Opposition") fails to establish a genuine issue of material fact. As set forth in Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment [Doc No. 38] ("Defendants' Memorandum"), Defendants' Response In Opposition To Plaintiff's Motion For Partial Summary Judgment [Doc. No. 48] ("Defendants' Opposition"), all supporting materials cited therein, and for the reasons set forth below, Plaintiff has no viable claim under the IWPCA, IMWL, or the FLSA. The undisputed facts, the plain language of the Shift Differential Policy, and the relied-upon wage protection statutes mandate the grant of summary judgment to Defendants, Chicago Mercantile Exchange Inc. ("CME") and CME Group Inc. ("CME Group") (collectively, "Defendants").

Plaintiff's Response To Defendants' Statement Of Material Facts [Doc. No. 52] ("Plaintiff's 56.1(b)(3) Stmt.") fails to raise a *genuine dispute* with many of Defendants' facts he contends are "partially disputed" or "disputed". Plaintiff's "disputes" are largely based on pure conjecture and argument from counsel, inadmissible opinion evidence, and inadmissible hearsay. (*See, e.g.*, Pl.'s 56.1(b)(3) Stmt. ¶¶ 27, 40, 43, 47). Other "disputes" are entirely non-responsive to Defendants' facts. (*See, e.g.*, *id.* ¶¶ 28, 44, 45, 51, 52, 71). In yet others, Plaintiff fails to cite any evidence to support his disagreement with Defendants' fact. (*See, e.g.*, *id.* ¶¶ 26, 42, 50, 67, 68). In sum, Plaintiff has failed to properly address or dispute Defendants' assertions of fact in most, if not all, of his allegedly "disputed" facts.

Furthermore, as set forth in more detail in Defendants' Local Rule 56.1(a) Response To Plaintiff's 56.1(b)(3)(C) Statement of Additional Facts ("Defs.' 56.1(a) Resp."), the majority of Plaintiff's additional "facts" are also unsupported by the cited record evidence, as is required by L.R. 56.1, and are nothing more than conjecture and argument from counsel. Some assertions

are even controverted by the record evidence or other "facts" as alleged by Plaintiff. As a result, Plaintiff fails to raise a genuine dispute with the material facts that entitle Defendants to summary judgment in this case. For a visual illustration of the factual deficiencies in Plaintiff's argument, attached hereto as Exhibit A is a copy of Plaintiff's Opposition in which each factual assertion lacking evidentiary support is underlined. The most pertinent are discussed below.

It remains undisputed that: (1) Plaintiff was paid a 10% shift differential in his first paycheck in January 2011, but this was recouped in his second paycheck, and he never again received a shift differential in his pay; (2) CME Group published a written Shift Differential Policy in April 2012, which states that employees "**may** be eligible to receive shift differential pay" and departments "**may** institute shift differential pay for their employees"; (3) as a prerequisite to shift differential pay, the Policy requires managers to **complete and submit a PERC form**, which must be **approved** by a Managing Director, and these things never happened with respect to Plaintiff; (4) no one in CME management or Human Resources ("HR") ever told Plaintiff he was entitled to receive shift differential pay pursuant to the Policy; (5) Plaintiff was specifically told in April 2014 that he would not receive shift differential pay; and (6) at no time after seeing the Policy did Plaintiff expect to receive shift differential pay from CME, yet he continued to work. In addition, there is no evidence demonstrating that CME agreed to pay Plaintiff a shift differential.

I. **PLAINTIFF HAS NO FACTUAL OR LEGAL BASIS TO SUPPORT HIS PRE-POLICY CLAIM TO SHIFT DIFFERENTIAL PAY**

Plaintiff has failed to offer *any* reason why the Court should not grant summary judgment to Defendants on Plaintiff's claims based on CME's unwritten shift differential practice prior to April 2012 (the "pre-Policy claims"). (Pl.'s Opp. at 9). When Plaintiff was directly asked during his deposition: "what is the basis for your claim for a shift differential from January 2011 until

April 2012?", Plaintiff's counsel objected on relevance grounds and stated on the record that Plaintiff was not claiming damages back to 2011. (Doc. No. 40-1, Walsh Deposition Transcript, 157:5-17). Plaintiff's counsel did not retract this waiver on any of the prior occasions it was communicated to the Court. (*See* Defs.' Mem. at fn. 3). Plaintiff now purports to partially retract this waiver and recast his claims to "the 'applicable' statute of limitation," without even specifying whether he refers to the FLSA, IWPCA or IMWL. (Pl.'s Opp. at 9).

In addition to the waiver, Plaintiff's claim has no substance. Plaintiff solely relies on Petrowski's alleged comment "[T]here is a shift differential" to support his pre-Policy claims. (Pl.'s 56.1(b)(3) Stmt. ¶¶ 36, 38). This sole alleged comment cannot constitute an agreement by Defendants to pay *Plaintiff* a shift differential, particularly in light of Plaintiff's awareness that CME clawed back the one shift differential payment it had made to him in January 2011 and that Plaintiff continued to receive paychecks for years thereafter, with no shift differential payments. (*See* Defs.' Mem. at 9-10). Therefore, Plaintiff has failed to raise a genuine dispute for trial on his pre-Policy claims.

## II. PLAINTIFF FAILS TO GENUINELY DISPUTE THAT THE PERMISSIVE LANGUAGE OF THE SHIFT DIFFERENTIAL POLICY IS DETERMINATIVE

Plaintiff offers no real response to Defendants' argument that the permissive language in the Shift Differential Policy controls its interpretation. (Defs.' Mem. at 11-12; Pl.'s Opp. at 2-5). Plaintiff's position that a policy must include the word "discretion" to be discretionary is misplaced. (Pl.'s Opp. at 3-5). Illinois courts have refused to find that policies which do not contain the word "discretion", but nonetheless are discretionary in nature, give rise to contractual obligations. *See, e.g., Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1347 (7th Cir. 1995) (finding that the employee could not reasonably believe that the statement "'Department Heads, with the approval of the Director, **may** dismiss any employee for just cause' would mean that he could only be

dismissed for just cause" because "the language of the statement is permissive, not mandatory") (emphasis added); *Lee v. Canuteson*, 573 N.E.2d 318, 322 (Ill. App. Ct. 3d Dist. 1991) (holding that an employee handbook that did not use the word "discretion" but stated that "a progressive discipline approach **may** be used" did not create a contractual right because "[t]his language clearly gave discretion to [] management to use progressive discipline or not in any given case as it saw fit, and so could not be construed as a promise to always use progressive discipline") (emphasis in original). In those situations, the Court relied on the permissive language of the policy. *See Lashbrook*, 65 F.3d at 1347; *Lee*, 573 N.E.2d at 322. Likewise, the language in the Shift Differential Policy is permissive and implies discretion in that it: (a) states that employees "**may** be eligible"; (b) states that departments "**may** institute shift differential pay"; and (c) requires management approval. (Doc. No. 39, Defendants' Local Rule 56.1 Statement Of Undisputed Material Facts ["DSF"] ¶¶ 43, 45-47).

Unlike the mandatory language in the contractually binding policies recognized in *Duldulao* and its progeny, the Policy does not include the words "automatic", "vested", or anything else to signify that shift differential pay is mandatory under any circumstances. *See, e.g.*, *Duldulao v. St. Mary of Nazareth Hosp.*, 505 N.E.2d 314, 318 (Ill. 1987) (emphasizing the mandatory language of the handbook – the terms "*cannot occur*," "*are never*," and "*are required*") (emphasis in original); *Dow v. Columbus-Cabrini Med. Ctr.*, 655 N.E.2d 1, 2-3 (Ill. App. Ct. 1st Dist. 1995) (mandatory language in employee handbook that "[e]mployees who retire… *will be paid* all unused sick days which have already been accrued" was an unambiguous offer under the *Duldulao* standard) (emphasis added). Plaintiff fails to raise a genuine dispute with any of the facts supporting the conclusion that the Shift Differential Policy's permissive language gives rise to a discretionary policy. (Pl.'s 56.1(b)(3) Stmt. ¶¶ 43, 45-47).

Plaintiff attempts to rely on the language in CME Group's new shift differential policy, issued nine months after the termination of Plaintiff's employment with CME and never applicable to Plaintiff, to interpret the Policy. (Pl.'s Opp. at 5). The Seventh Circuit has held that Federal Rule of Evidence 407 bars such an argument. In *Pastor v. State Farm Mutual Automobile Insurance Company*, plaintiff attempted to introduce evidence that defendant's post-litigation amendment to clarify its insurance policy was "a confession that [plaintiff's] interpretation of the original clause [was] correct." 487 F.3d 1042, 1045 (7th Cir. 2007). The Court found that the subsequent revision was "obviously… not a confession" and to permit plaintiff to introduce such evidence would "discourag[e] efforts to clarify contractual obligations, thus perpetuating any confusion caused by unclarified language in the contract." *Id.* The Court therefore concluded that using "a revision in a contract to argue the meaning of the original version would violate Rule 407". *Id.*

At the time the Shift Differential Policy was drafted and implemented in 2012, no one at CME would have dreamed that someone would claim that the Policy was <u>not</u> discretionary, in light of its permissive language and its requirement of management approval. But in the face of the extensive written discovery, three motions to compel, and ten depositions over the last year of this litigation, Defendants added even more explicit language about the discretionary nature of shift differential pay when revising CME Group's shift differential policy in December 2016.[1] Like the plaintiff in *Pastor*, Plaintiff argues that the inclusion of the word "discretion" in CME Group's new, post-litigation shift differential policy "necessarily proves" that the Policy at issue in this case was *not* discretionary. (Pl.'s Opp. at 5). Plaintiff's argument runs afoul of Rule 407

---

[1] As explained by Tolsky during his deposition, CME Group was compelled to revise its shift differential policy in December 2016 due to the change in its human resource information system from PeopleSoft HR to Workday and Workday's vastly different functionality. (Doc. No. 41-21, Tolsky Deposition Transcript, 34:22-35:14, 37:4-18).

and should therefore be rejected. *See Pastor*, 487 F.3d at 1045; *see also Smith v. Family Video Movie Club, Inc.*, No. 11 C 1773, 2017 U.S. Dist. LEXIS 19725, at *7-9 (N.D. Ill. Feb. 13, 2017) (Rule 407 barred evidence of a new, post-litigation timekeeping code for purposes of proving liability on FLSA and IMWL off-the-clock claims). Even if this were not the case, a factfinder could not draw a reasonable inference that the Shift Differential Policy was not already discretionary simply because a more explicit statement was added to the new policy.

### III. THE SHIFT DIFFERENTIAL POLICY DID NOT CREATE A CONTRACTUAL AGREEMENT TO PAY PLAINTIFF A SHIFT DIFFERENTIAL

Plaintiff cites to *Pelizza v. Reader's Digest Sales and Services, Inc.* for the proposition that a policy that imposes obligations on both the employer and the employee is an agreement, regardless of whether it was bargained for. 624 F. Supp. 806, 810 (N.D. Ill. 1985). *Pelizza* was decided before and superseded by the Illinois Supreme Court's decision in *Duldulao*.[2] *Cook v. UPS*, No. 06-CV-954-JPG, 2007 U.S. Dist. LEXIS 31616, at *5 fn.2 (S.D. Ill. April 30, 2007). No Illinois court has affirmed *Pelizza*'s reasoning since *Duldulao* was decided in 1989. Nevertheless, even under *Pelizza*'s reasoning, the Shift Differential Policy does not rise to the level of a contract because it does not impose any obligations on CME employees, who were obligated to work their assigned shifts, regardless of the Policy. The Policy did not impose any new or different obligations on employees receiving shift differential pay.

In an attempt to sidestep the IWPCA's requirement of "mutual assent", Plaintiff tries to distinguish the instant case from *Schneider v. Ecolab*, No. 14 C 01044, 2015 U.S. Dist. LEXIS 37440 (N.D. Ill. Mar. 25, 2015). Defendants deny that *Schneider* is distinguishable, but, even if it were, claims brought under the IWPCA nonetheless require proof of mutual assent. *See Zabinsky v. Gelber Grp., Inc.*, 347 Ill. App. 3d 243, 249 (Ill. App. Ct. 2004) (claims under the

---

[2] For the reasons set forth in Defendants' Opposition, Plaintiff's claims likewise fail under the *Duldulao* standard. (Defs.' Opp. at 6-10).

IWPCA based on an employment agreement require a "manifestation of mutual assent"); *see also Cohan v. Medline Indust. Inc.*, 170 F. Supp. 3d 1162, 1176 (N.D. Ill. 2016) (same). Plaintiff has failed to muster any evidence to indicate Defendants agreed or assented to pay Plaintiff a shift differential under the Policy. (Pl.'s 56.1(b)(3) Stmt. ¶¶ 52, 56, 71). *See Schneider*, 15 U.S. Dist. LEXIS 37440, at *16-17 (plaintiff testified that had no expectation of additional pay at time of hiring but his suspicions that he was underpaid were aroused over time, revealing that plaintiff ultimately "discovered" he was allegedly underpaid, not that the employer "reneged on a purported agreement, which the parties supposedly shared all along").

### IV. THE SHIFT DIFFERENTIAL POLICY IS DISCRETIONARY IN THAT IT LEAVES THE DECISION WHETHER OR NOT TO PAY SHIFT DIFFERENTIAL TO MANAGEMENT

The Shift Differential Policy was not implemented until April 2012 so, of course, DCCI management could not have been aware of it during the hiring process of Plaintiff and others in 2010 and 2011. (Pl.'s 56.1(b)(3) Stmt. ¶¶ 11, 39). Nevertheless, Petrowski and Bearden made a conscious decision to offer the new DCCI employees a rate of pay which accounted for the rotating nature of the time and location of work shifts, even if they did not specifically contemplate whether or not to pay a shift differential. (DSF ¶¶ 12-14).

After the Policy was implemented, DCCI management did not elect to offer a shift differential to the DCCI employees. Plaintiff has failed to adduce any evidence to support his implied assertion that Petrowski was required to make a conscious decision about whether or not to pay a differential pursuant to the Policy, let alone that the fact that Petrowski did not make the decision is dispositive or even relevant. (Pl.'s Opp. at 8; Pl.'s 56.1(b)(3) Stmt. ¶ 52). Because the language of the Policy is permissive, there is no action required of a manager who is not interested in paying a shift differential under the Policy. (DSF ¶¶ 43, 45-47). That Petrowski did not see the Policy until November 2016 does not change the undisputed fact that he never sought

extra pay for employees working non-standard shifts, let alone approved the payment of a shift differential to them. (Pl.'s 56.1(b)(3) Stmt. ¶ 52). In addition, in July 2012, Bearden told Human Resources (without having seen the written Policy) that DCCI was not paying and did not intend to pay a shift differential. (DSF ¶¶ 50-51). Despite Bearden's unfamiliarity with the written Policy at that time, Tolsky nonetheless accepted DCCI management's decision as consistent with the Policy, which refutes Plaintiff's unsupported theories.

Plaintiff next attempts to attack the fairness of the reason the DCCI was not paid a shift differential, which is irrelevant to the question presented at summary judgment. The Policy states that management can choose to pay a shift differential; it logically follows that management can choose <u>not</u> to pay a shift differential. The Policy does not limit the reasons why management can so choose. Plaintiff has not presented any evidence (nor can he) as to how the reason a department is not paid a shift differential is relevant to whether the Policy created an agreement to pay a shift differential in the first place. As such, Plaintiff's lengthy discussion about the communications between DCCI management and HR (seemingly in support of some kind of conspiracy theory) is entirely misdirected.

Even so, Plaintiff's conspiracy theory of "fabricated justifications" is unsupported. The undisputed facts show that Defendants were consistent in their interpretation and administration of the Shift Differential Policy from the time it was implemented in April 2012 until the termination of Plaintiff's employment. By July 18, 2012, Tolsky became aware that the non-exempt employees in the DCCI were not being paid a shift differential and accepted this decision as allowable under the Policy. (Pl.'s 56.1(b)(3) Stmt. ¶¶ 50-51).[3] If the Policy were mandatory,

---

[3] Plaintiff does not dispute this portion of paragraph 50. While Plaintiff disagrees with the cited fact from paragraph 51, he offers no evidence to raise a genuine dispute of fact to counter Tolsky's sworn testimony. Instead, he argues that Tolsky's failure to immediately recollect all the details surrounding his exchanges with DCCI management two years later, in 2014, indicates that the 2012 conversation never

as Plaintiff argues, the reasonable inference is that HR would have enforced it in the DCCI, and not that HR was part of a conspiracy to withhold shift differential pay from the DCCI. HR never sought to compel the payment of a shift differential to the DCCI, either in 2012, or when the issue resurfaced in 2014 and 2016.

Plaintiff tries to use the HR communications from 2014 and 2016 to obscure the undisputed fact that Tolsky approved the decision not to pay the DCCI a shift differential as allowable under the Policy in 2012. (Pl.'s Opp. at 3-4). But Tolsky's 2014 and 2016 communications relay information consistent with what he learned from DCCI management in 2012. In 2014, Tolsky told Francis that he "believe[d] they just bake it into their initial salary offer or something, as most of the team works off-hours." (Doc. No. 52-14, at CME000560). He suggested that Francis "tweak" the response she intended to provide to Plaintiff to clarify that the decision not to pay a shift differential in the DCCI was "made by division management there" and not suggested by HR. (Doc. No. 52-14, at CME000557). This "tweak" to the response to be provided to Plaintiff is entirely consistent with Tolsky's July 2012 conversation with Bearden, during which he learned that DCCI did not pay its employees a shift differential based on a decision made by management. (DSF ¶ 50). In 2016, Tolsky again explained to Francis that the non-exempt employees in the DCCI were not paid a shift differential based on a decision made by DCCI management, which remains consistent with what he learned in July 2012 from Bearden. (DSF ¶¶ 50, 68). When Francis responded to the DCCI employees in March 2016, she relayed this concept for a third time, that "management made the decision" not to pay a shift differential. (Doc. No. 40-7, May 12, 2017 Declaration of Elizabeth Francis, Ex. C). Any variances in the exact language used by Tolsky or Francis over those four years does not change the undisputed fact that HR was consistent, from July 2012 through March 2016, in

---

occurred. This is improper argument by counsel and, more importantly, does not raise a genuine dispute.

its position that DCCI employees would not receive shift differential pay under the Policy, and any time the reason was stated it was consistent.

Finally, Plaintiff tries to draw a connection between the DCCI and the DCE in another attempt to argue that the Policy was not discretionary. (Pl.'s Opp. at 5-6). None of the "facts" alleged by Plaintiff support this conclusion. First, DCE manager Blake Bercher implemented shift differential pay in 2011 – at least six months before the Policy was implemented in April 2012. (Defs.' 56.1(a) Resp. ¶¶ 107, 108). For that reason alone, the discussions surrounding the implementation of shift differential pay in the DCE are not informative, let alone determinative, as to how a written Policy that was not adopted until April 2012 should be interpreted. Regardless, none of Bercher's communications with Tolsky indicate that shift differential pay was mandatory in 2011; Tolsky simply indicated which shifts would *qualify* for shift differential pay but was not asked about nor did he opine on whether DCE was *required* to pay its employees working qualifying shifts a differential. (Doc. No. 52-11, at BERCHER_014-015). Similarly, Bercher's 2013 communication with Tolsky does not support Plaintiff's reading of the Policy. In January 2013, in an email response to Bercher, Tolsky pointed to the definitions section of the Policy to explain which shifts would *qualify* for shift differential pay. (Doc. No. 52-13, at BERCHER_017). When Tolsky's response is read in the full context of the email chain, it is apparent that he was directly commenting on what constitutes a qualifying shift under the Policy, which would <u>allow</u> the manager to offer shift differential pay, and not offering any opinion as to whether the DCE employees should or should not be receiving shift differential pay. Notably, Tolsky specifically states that the non-standard shift "would be *eligible* for the differential" but says nothing to indicate those employees *must* receive a differential, suggesting, once again, that management had discretion whether to pay a shift differential under the Policy.

### V. IT IS UNDISPUTED THAT PLAINTIFF HAD NO EXPECTATION OF RECEIVING SHIFT DIFFERENTIAL PAY PURSUANT TO THE POLICY

Plaintiff admits that he did not see the Shift Differential Policy until late 2013, when he "happened to see" it for the first time on OpenExchange. (Pl.'s 56.1(b)(3) Stmt. ¶ 54). Plaintiff could not have consented to the terms of a Policy of which he was unaware. *Schneider*, 2015 U.S. Dist. LEXIS 37440, at *15 (IWPCA requires a "'manifestation of mutual assent' from *both* parties"). And if he was not even aware of the Policy's contents prior to late 2013, he could not possibly have believed that an offer had been made. *Duldulao*, 505 N.E.2d at 318 (employee must be aware of the contents of the policy statement). Plaintiff attempts to salvage this part of his claim by contending that he expected to receive a shift differential pursuant to the Policy based on Petrowski's purported statement "[T]here is a shift differential". (Pl.'s Opp. at 12). Plaintiff's reliance is misplaced. Petrowski's purported statement – allegedly made in January 2011 – cannot possibly support Plaintiff's claim that he expected to receive a shift differential pursuant to a Policy that did not come into an existence until April 2012, more than a year later. Moreover, this position is undermined by Plaintiff's own testimony that he did not expect to receive a shift differential in his pay, as early as March or April 2011:

> Q. Okay. After your conversations with Wayne and Mike Briskey [in March or April 2011], did you expect to receive a shift differential in your next paycheck?
> A. No.
> Q. All right. So you realize you're not going to be receiving a shift differential after you have these conversations with Wayne and Mike. Why did you continue to come to work?
> A. **Why did I continue to come to work? Because I liked working there.**

(Walsh Dep., 77:11-20). Therefore, based on the undisputed facts in the record, Plaintiff had no expectation of receiving shift differential pay prior to the time he saw the Policy in late 2013.

At the time Plaintiff eventually did see the Policy, in late 2013, he knew he was not receiving shift differential pay. And while he testified that he thought he *should* be receiving

shift differential pay, the deposition testimony cited by both parties makes it clear that Plaintiff did not *expect* to receive a shift differential in his pay:

> Q. So every time you received a check after that, you expected to see a shift differential in there?
> A. Well, **I knew I wouldn't**, but I thought I should be getting one.
> Q. Okay. So those are two different things. That's why I want to make sure we're on the same page. So you thought you should be receiving a shift differential; right?
> A. Correct.
> Q. But – **but you were not expecting to see one** in your Earnings Statement?
> A. **Correct**.

(Walsh Dep., 90:9-20) (emphasis added). Plaintiff repeatedly testified that he did not expect to receive a shift differential in his pay after he saw the Policy:

> Q. . . . [W]hen you received Liz's email [in April 2014], were you expecting a shift differential in your next paycheck?
> A. No.
> \* \* \*
> Q. At any point from the time you received Liz's e-mail in April 2014 through the end of your employment in March 2016, were you expecting to receive a shift differential in your paycheck?
> A. No.

(Walsh Dep., 95:14-17, 96:11-15). Plaintiff's assertion that he "*unequivocally* testified that he expected to receive a shift differential pay after he saw the policy" (Pl.'s Opp. at 13) is thus a blatant misrepresentation of the evidentiary record. It also directly conflicts with his admission that "he thought he *should* be getting a shift differential pay but **knew that he would not get it** or **did not expect to get it**". (Pl.'s 56.1(b)(3) Stmt. ¶ 56 (citations omitted) (emphasis added)).

Plaintiff's declaration, included with his L.R. 56.1(b)(3) Statement, fails to create an issue of fact about his expectations for shift differential pay. (Pl.'s 56.1(b)(3) Stmt. ¶ 56). Even in this declaration, Plaintiff only avers "I always thought *I should be getting* shift differential pays during my employment with the defendants" and does not, at any point, state under oath that he *expected* to receive a shift differential in his pay. (Doc. No. 52-32, ¶ 8). Regardless,

even if the declaration could possibly be interpreted to support an expectation to shift differential pay, Plaintiff cannot manufacture a genuine issue of fact for trial through submission of an affidavit contrary to his deposition testimony. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996) ("[P]arties cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions."). The inclusion of this declaration, procured after the close of discovery, also undermines Plaintiff's pending motion to strike the Petrowski, Tolsky, and Francis declarations. [Doc. No. 44].

## VI. ANY CLAIM TO SHIFT DIFFERENTIAL PAY IS DEFEATED BY PLAINTIFF'S IMPLIEDACCEPTANCE OF DEFENDANTS' PAYMENT TERMS

Plaintiff fails to offer any real response to the undisputed facts showing that he accepted Defendants' payment terms by continuing to work knowing that he would not receive a shift differential. As detailed above and in Defendants' Memorandum, once Plaintiff realized that the 10% shift differential in his first paycheck had been clawed back, by April 2011, he concedes that he never again expected to receive a shift differential from CME. (Defs.' Mem. at 13-14). Plaintiff continued coming to work and collecting his paycheck for **five years** after this realization. These undisputed facts defeat Plaintiff's claims as a matter of law. *See, e.g.*, *Cohan*, 170 F. Supp. 3d at 1176; *Duberville v. WMG, Inc.*, No. 13 C 02061, 2015 U.S. Dist. LEXIS 4157, at *26 (N.D. Ill. Jan. 13, 2015) ("If the at-will employee continues to work after a change in commission plan, he is deemed to have accepted the change. This is true even if the employee's continued performance is grudging and protest-filled.") (internal citations omitted). Plaintiff has not raised facts, even when viewed in the light most favorable to him, to support the inference that he rejected Defendants' decision not to pay him a shift differential.

Of course, contrary to Plaintiff's assertion, there is no authority stating that the issue of implied acceptance is a "question of fact to be determined by . . . the jury". (Pl.'s Opp. at 14).

The cases cited by Plaintiff do not support this assertion.[4] *See, e.g.*, *Cohan*, 170 F. Supp. 3d at 1176 (granting summary judgment because the undisputed evidence confirmed an implied acceptance of the modified terms of compensation). Whether Plaintiff's undisputed conduct constitutes an implied acceptance of Defendants' modified terms of compensation is thus a question of law suitable for resolution by the Court.

## VII. CONCLUSION

Defendants respectfully submit that the Court should enter summary judgment against all claims in Plaintiff's Complaint.

Dated: July 5, 2017

Respectfully submitted,

CHICAGO MERCANTILE EXCHANGE INC., and CME GROUP INC.,


 /s/ Stephanie L. Mills-Gallan
One of Their Attorneys

David K. Haase (ARDC# 6201278)
Stephanie L. Mills-Gallan (ARDC #6313506)
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1000
Chicago, IL  60654
Telephone: (312) 372-5520
Facsimile: (312) 372-7880
*dhaase@littler.com*
*smillsgallan@littler.com*

---

[4] *See Household Fin. Servs., Inc. v. Coastal Mort. Servs., Inc.*, 152 F. Supp. 2d 1015, 1023-24 (N.D. Ill. 2001) (denying summary judgment where it was undisputed that the parties deviated from the terms of the written contract but the extent of contract modification was a disputed issue for trial); *Coventry Health Care Workers Comp., Inc. v. Medicor Managed Care, LLC*, No. 10 C 7814, 2012 U.S. Dist. LEXIS 31665, at *6-7 (N.D. Ill. Mar. 9, 2012) (summary judgment is inappropriate when a genuine issue of material fact exists as to whether the parties modified a contract or to the extent or manner of contract modification). Moreover, these cases are inapposite because they refer to modifications of a contract whereas there is no contract at issue in this case.

## CERTIFICATE OF SERVICE

I, Stephanie L. Mills-Gallan, an attorney, certify that on July 5, 2017, I electronically filed *Defendants' Reply In Support Of Their Motion For Summary Judgment* via the CM/ECF filing system with the United States District Court for the Northern District of Illinois, and that the following CM/ECF participants were served with a copy of same through the CM/ECF filing system:

Samuel Shim
Hyo Jung Kim
LAW OFFICES OF SAMUEL SHIM
3501 Algonquin Road, Suite 600
Rolling Meadows, IL 60008
*sshim.law@gmail.com*
*rosabaekim.esq@gmail.com*


        */s/ Stephanie L. Mills-Gallan*
        Stephanie L. Mills-Gallan

Firmwide:148241080.7 059775.1026