UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. 16 CV 6224 |
| v. | Judge Manish S. Shah |
| CHICAGO MERCANTILE EXCHANGE INC., and CME GROUP, INC., | |
| Defendants. | |

MEMORANDUM OPINION AND ORDER

Michael Walsh, a former at-will employee of Chicago Mercantile Exchange, alleges that CME failed to provide him with shift differential payments for working qualifying shifts, such as nights and weekends. Walsh argues that CME's company-wide shift differential policy guaranteed him increased pay and that his supervisor assured him he would receive such payments. Walsh brings suit to recover these payments under the Fair Labor Standards Act, the Illinois Wage Payment and Compensation Act, and the Illinois Minimum Wage Act. Both Walsh and CME move for summary judgment.

I.  Legal Standard

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law. Fed. R. Civ. P. 56(a); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014). A genuine dispute as to any material fact exists if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Village of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## II. Background

Defendant CME operated as a wholly owned subsidiary of defendant CME Group. [52] ¶ 2.[1] Defendants operated a derivatives exchange on which futures contracts, and options on futures contracts in various asset classes, were traded via an electronic trading platform and a physical trading floor. [52] ¶ 1. CME employed Walsh as an at-will employee from January 2011 through March 2016 [49] ¶ 1; [52] ¶¶ 23–24.

### A. Motion to Strike

Plaintiff filed a motion to strike defendants' Exhibits 3, 5, and 7 in support of their motion for summary judgment. The three exhibits at issue are declarations taken from Robert Petrowski, Jason Tolsky, and Elizabeth Francis, all dated

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendants' response to plaintiff's LR 56.1 statement of fact [49], plaintiff's response to defendants' LR 56.1 statement of fact [52], and defendants' response to plaintiff's statement of additional facts [55], where the asserted fact and accompanying response are set forth in the same document.

2

between May 10 and 12, 2017. Plaintiff moves to strike these declarations pursuant to Rule 37(c), arguing that they were obtained after the close of discovery. However, nothing in the Federal Rules prohibits this practice. *See Black & Decker Corp. v. Positec U.S.A. Inc.*, No. 11 C 5426, 2015 WL 1543262, at *12–13 (N.D. Ill. March 31, 2015). Rule 37(c) provides, in part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Rule 26(a) requires disclosure of "the name and, if known, the address and telephone number of each individual likely to have discoverable information" and "a copy—or description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A). Under Rule 26(e):

> A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

"The obligation to supplement responses to formal discovery requests applies to interrogatories, requests for production, and requests for admissions, but not ordinarily to deposition testimony." Fed. R. Civ. P. 26 Advisory Committee Note.

3

Defendants disclosed Petrowski, Tolsky, and Francis as potential witnesses in their Rule 26(a) initial disclosures, and plaintiff has failed to point out any inconsistencies between these declarations and other portions of the record. The rules do not prohibit taking a declaration by a disclosed witness after the close of discovery. The motion to strike is denied.

B.   Relevant time period

Defendants argue that plaintiff has waived any claims for shift differential payments arising prior to June 16, 2013. [38] at 9. Defendants base this argument on statements plaintiff's counsel made during a deposition of Walsh, and plaintiff's failure to object to, or clarify, those statements in subsequent proceedings. *Id*. At issue is counsel's response to a question about the basis for plaintiff's claims for shift differential pay from January 2011 to April 2012. Plaintiff's counsel responded:

> I'm going to object on relevance grounds. Counsel, as you're—as you're well aware, the statute of limitations only goes back, if we assume willful, only three years, and I think that renders anything—as far as his claims going back to 2011, obviously, are not an issue. *Id.*

When defendants' counsel pointed out that plaintiff was, in fact, claiming damages back to 2011, plaintiff's counsel said, "[n]o, we're not. By law, we can't do that." *Id*.

In plaintiff's response to defendants' motion for summary judgment, plaintiff attempted to clarify that his counsel had been referring only to the statute of limitations under the FLSA, and not the IWPCA, which has a longer statute of limitations. *See* 735 ILCS 5/13-205, 5/13-206. Though this is far from clear from counsel's statements at Walsh's deposition, it appears that counsel made a mistake

4

of law as to the applicable statute of limitations, not a deliberate waiver of his client's claims. For this reason, I will consider plaintiff's IWPCA claims arising prior to June 2013.

### C. CME and DCCI

CME's data centers house the servers for the CME Globex electronic trading platform [52] ¶ 7. A data center is comprised of server cabinets, heavy air conditioning, and reliable electric power. [49] ¶ 12. In June 2008, CME created the Data Center and Critical Infrastructure Department ("DCCI"), responsible for, among other things, the daily operation of CME's data centers and critical infrastructure sites, including their electrical, mechanical, and HVAC systems. [49] ¶ 23; [52] ¶ 6. Initially, CME had one remote data center in Lombard, Illinois, and then added a second, called the Annex or ADC, in Chicago. [49] ¶ 9. They began construction of a third—known as DC3—in Aurora, Illinois in 2008, completing the first phase of construction in 2010. [49] ¶ 10. CME finished the next phase of construction a year or two later, and people began moving in to the new suites in February 2013. *Id.* Around July 2011, the DCCI at the DC3 location started operating on a 24/7/365 basis. *Id.* ¶ 21. In November 2011, a separate CME department at DC3—Data Center Engineers—switched to 12-hour shifts to accommodate the need for 24-hour coverage. [52-26] at 65:6–10.

Robert Petrowski was the managing director of DCCI. *Id.* ¶ 17; [52] ¶ 8. When DCCI was formed in 2008, Petrowski had approximately eight employees working under him. [49] ¶ 24. Wayne Bearden and Michael Briskey both reported

5

directly to Petrowski. [52-28] at 13:1–5; [52-29] at 28:13–22. Bearden was responsible for making employee schedules and assigning shifts and locations. [49] ¶ 30. Petrowski would look at the schedules before Bearden emailed them to the employees to check whether the proposed schedule would create certain conflicts for the employee—such as missing a class. *Id*. Briskey took over at least some of Bearden's responsibilities in 2014. [55] ¶ 76. Petrowski, Bearden, and Brisky emphasized to DCCI employees the requirement that the data center operate consistently, 24 hours a day, seven days a week, 365 days a year. [49] ¶ 29. Petrowski told employees, and Bearden and Brisky repeated: "We can never go down. If our data centers for CME Group w[ere] down one hour, it would affect the U.S. economy. If it was down for two hours, it would affect the world economy." *Id*.; [55] ¶ 94. DCCI employees had to share on-call duties and monitor and respond to relevant alarms. [41-4] at 1.

### D. CME's written shift differential policy

In April 2012, CME published a written policy on shift differential compensation. [52] ¶ 39. The policy replaced and superseded CME's previously unwritten shift differential practice and remained unchanged through March 31, 2016. *Id*.; [55] ¶ 80. The 2012 policy set forth the eligibility criteria to qualify for shift differential pay, as well as the procedure and necessary approvals. [52] ¶ 41. The policy stated:

> All U.S. and international employees of the following CME Group Inc. companies . . . may be eligible to receive shift differential pay: Chicago Mercantile Exchange Inc., CME Group Clearing Europe, [etc.]. . . . Employees at or above the Executive Director level, Security Officers, and employees

6

>covered by a collective bargaining agreement are not eligible for shift differential pay.
>
>Only those departments with jobs requiring continual coverage, as approved by management, during qualifying shifts may institute shift differential pay for their employees. Employees may be assigned to a qualifying shift and receive shift differential pay on a temporary or permanent basis. Employees may also work a qualifying shift, but not receive shift differential pay if the schedule is not required by business needs. [52-1] at 1.

The purpose of the policy was "to provide additional compensation for employees who are required to work a second, third or non-standard shift due to a defined business need." *Id*.

The policy defined "shift differential" as "a premium applied to an employee's base salary (exempt employees) or base hourly rate (non-exempt employees) to compensate them for working a qualifying shift to which they have been assigned. CME Group provides a flat 10% of base salary or base hourly rate as the shift differential pay to employees working a qualifying shift. For non-exempt employees, the adjusted base hourly rate will be used to calculate overtime pay and pay for benefit time taken." *Id*.

Second, third, and non-standard shifts qualified for shift differential. The qualifying shifts were defined as follows: second shift was a shift where the standard work day began between 12:00 PM and 7:59 PM; third shift was where the standard work day began between 8:00 PM and 3:59 AM; and non-standard shifts were shifts where the standard workweek was Tuesday through Saturday, or Sunday through Thursday. *Id*.

The policy also outlined the proper procedure for instituting shift differential pay to a qualifying employee, *id.* at 2:

> In order for an employee to qualify for shift differential pay, there must be a defined departmental business need to have the employee working the assigned shift. Employees working qualifying shifts as a result of the Flexible Work Arrangement Policy will not be eligible to receive shift differential pay. Likewise, employees choosing to work non-standard shifts for personal reasons will not qualify for shift differential pay.
>
> To provide an employee with shift differential pay, managers must complete the PeopleSoft Employee Record Change (PERC) form and submit it to HR. The manager should include the employee's work hours on the form. Keep in mind that it is the manager's responsibility to ensure there is a defined business need for having the employee assigned to a qualifying shift. The PERC form providing an employee with shift differential pay requires MD approval.
>
> It is the manager's responsibility to complete the PeopleSoft Employee Record Change (PERC) form and submit it to HR when an employee's schedule changes to a non-qualifying shift. At that time, the employee will no longer receive shift differential pay.

On the last line, the policy provided a contact number, which was the general HR phone number. *Id.*

### E. The hiring process and plaintiff

Petrowski and Bearden participated in the interviewing and hiring process for DCCI employees. [52] ¶ 12. At the beginning of the hiring process Petrowski worked with Bearden and Human Resources to set a starting hourly rate. [40-3] ¶ 11. In doing so, Petrowski considered a number of factors including: the salary range for similar positions in the market, the rotating nature of the time and location of shifts, the need to work overtime and weekends, and the type of work the employees would perform. *Id.* ¶ 12. Throughout the process Petrowski told

candidates and new hires that it was a hard job and they would "work a lot of overtime and work nights, midnights, or afternoons." [49] ¶ 47. At no point during the hiring process, or immediately after, did anyone mention shift differential pay. *Id*.; [52] ¶¶ 14, 19.

Walsh applied for a Supervisor Building Operations position with DCCI in or around December 2010. [52] ¶ 15. On December 16, 2010, CME extended an employment offer to him, with a starting hourly pay of $34. [52] ¶¶ 18, 20. The job-offer letter did not reference a shift differential, and the concept of a shift differential was not mentioned to Walsh prior to his start of employment. [52] ¶¶ 18, 21–22. Walsh accepted CME's offer and began working for CME on January 10, 2011. [52] ¶ 23. Throughout his time at CME, Walsh was an at-will employee. [52] ¶ 24.

In the first week of his employment, Walsh opened his human resources profile on the computer and saw a notation stating that he was "second shift 10 percent shift differential." [41-22] at 59:1–11; [52] ¶ 30. When he showed one of his DCCI coworkers the notation, the coworker indicated that he was not receiving shift differential. *Id*. The next day, Walsh approached Petrowski to tell him that his coworker had seen the shift differential notation on Walsh's profile. [52] ¶ 31. Walsh told Petrowski, "I'm sorry that I let [the coworker] see that." Petrowski said in response, "[D]on't worry about what you did, Mike, that's fine. There is a shift differential. There is a shift differential." *Id*. Walsh replied, "[O]kay, sorry about that," and the conversation ended. *Id.* Petrowski did not say anything else to Walsh

about a shift differential during this conversation or at any other time during Walsh's employment with CME. *Id*. Walsh received a ten percent shift differential in his first paycheck. [40-2] at 3. That ten percent, however, was recouped from his second paycheck.[2] *Id*. at 4. Aside from his first paycheck, Walsh never received shift differential payment from CME. [52] ¶ 35.

Walsh "happened to see" CME's written 2012 Shift Differential Policy for the first time when he was looking at the Human Resources policies on the intranet sometime in late 2013. [52] ¶ 54. After Walsh saw the written policy for the first time, he thought he should receive a shift differential, though he did not expect to receive one. [40-1] at 90:6–20. He also came across an article or blog post written by the Associate Director at CME Group's Globex Control Center in Chicago, stating that he received a ten percent shift differential. [52] ¶¶ 36–37.

In July 2012, Jason Tolsky, CME Group's Director of Compensation, emailed Bearden and Briskey asking if any of the DCCI employees were working qualifying shifts because records showed that none of the DCCI employees were receiving shift differential pay. [41-12] at 1. In response, Bearden asked Tolsky to "call [his] cell." *Id*.[3] In 2014, Walsh called Elizabeth Francis, Senior Director of Employee relations, to discuss the shift differential. [52] ¶ 57. In April of 2014, Francis emailed Tolsky

---

[2] As Walsh points out, the shift differential Walsh received for the 1.5 overtime hours from his first paycheck was not recouped in his second paycheck. *See* [40-2] at 3–4.

[3] Briskey testified that he did not know who Tolsky was, nor did he remember receiving the email. He stated, however, that when he and Bearden both received an email he deferred to Bearden as the more senior member of management, and so once he saw Bearden's response to Tolsky he knew Bearden had addressed the issue. [41-29] at 144:6–145:3; [49] ¶ 58.

10

to ask whether Walsh should be receiving shift differential payments. [41-14] at 5. In response, Tolsky stated—in reference to DCCI—"I believe they just bake [shift differential] into their initial salary offer or something, as most of the team works off-hours. . . . I may be getting that wrong, but I thought there was some rationale that exists."[4] *Id.* at 4. Francis then noted that she would inform Walsh that he received shift differential on his first paycheck by mistake and that building operations and security personnel were not paid shift differential per CME policy. *Id.* at 2. Tolsky then suggested that Francis tweak her response to Walsh to show that this was not per CME policy, but rather a decision made by division management, and Francis thanked him. *Id.* at 1.

In March 2016, CME negotiated the sale of DC3 to CyrusOne. [52] ¶ 61. As part of the transaction, CME agreed to terminate the employment of DCCI employees working at DC3, and those individuals would become employed by CyrusOne. *Id.* Francis had two meetings with the DCCI employees about the transition to CyrusOne. *Id.* ¶ 62. At the meetings, DCCI employees asked Francis about why they were not receiving shift differential payments. [52-22] at 105:19–107:22; [52-24] at 77:12–78:21; [52-25] at 162:16–168:14. Afterward, each employee contacted Francis directly about his individual situation. [52] ¶ 64. Francis told the DCCI employees that she would look into the issue and get back to them. *Id.* ¶ 65.

---

[4] Walsh disputes the fact that shift differential was baked in to the DCCI employees' pay. He argues that because Petrowski never instructed Bearden to inform candidates that shift differential was baked in to their pay, Petrowski must not have taken it into account when setting the pay rate. However, what Petrowski did or did not consider in setting the employee pay rates has no impact on Walsh's claims, which turn on whether CME has agreed to make shift differential pay part of his regular rate of pay.

11

That same day, Francis emailed Petrowski about the issue, asking him not to discuss the shift differential with the DCCI employees until she received the go-ahead from the legal department. [49] ¶ 71; [52-15] at 1. Later, Francis told the DCCI employees, including Walsh, they were not eligible to receive shift differential pay under the policy based on a decision made by DCCI management. [52] ¶ 69.

Plaintiff's employment with CME ended on March 31, 2016, and plaintiff then became an employee of CyrusOne. [52] ¶¶ 72–73. Plaintiff filed his lawsuit against defendants on June 15, 2016. [52] ¶ 74.

### III. Analysis

Walsh alleges that CME agreed to provide him shift differential payments, both through CME's 2012 written policy, and through Petrowski's statement to him that "[t]here is a shift differential." Defendants' failure to provide him with these payments, plaintiff argues, violates the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq*. Because none of these statutes requires employers to institute shift differential, and they merely ensure that employers honor the promises they make to their employees, plaintiff's claims turn on whether CME agreed to pay him shift differential.

The IWPCA requires employers to timely pay earned wages to their employees. 820 ILCS 115/3–5. The IWPCA does not independently entitle employees to shift differential payments, rather the purpose is to ensure that employers honor the wage and payment terms of existing employment agreements.

12

820 ILCS 115/3; *see also Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1175 (N.D. Ill. 2016), *aff'd* 843 F.3d 660 (7th Cir. 2016) (noting that the IWPCA "does not . . . confer rights to compensation that are absent from the employee's contract or employment agreement"). An "agreement" under the Act is "broader than a contract," and "requires only a manifestation of mutual assent on the part of two or more persons." *Hess v. Kanoski & Assoc.*, 668 F.3d 446, 452 (7th Cir. 2012). However, without an agreement, an employee can have no claim under the IWPCA. *Brown v. Lululemon Athletica, Inc.*, No. 10 C 05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 24, 2011); *see also Stark v. PPM Am., Inc.*, 354 F.3d 666, 672 (7th Cir. 2004).

Similarly, neither the FLSA, nor the IMWL, independently confers a right to shift differential payments for nonstandard shifts. Both statutes require employers to compensate non-exempt employees at a rate of one and one-half times their "regular rate" of pay for hours worked in excess of forty hours in one week. 29 U.S.C. § 207(a); 820 ILCS 105/4a(1). The FLSA defines "regular rate" of pay to include "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C. § 207(e). The definition excludes overtime premiums. 29 U.S.C. § 207(e)(5)–(7). But non-overtime premiums, such as shift differentials, are included in the regular rate of pay. 29 C.F.R. § 778.207. As a result, whether defendants must include shift differential in calculating plaintiff's regular rate of pay under the FLSA and IMWL also depends on whether CME ever agreed to pay Walsh shift differential.

Walsh claims that CME owes him shift differential pursuant to the 2012 CME Group company-wide written policy. Additionally, Walsh argues that Petrowski's statement to him that "[t]here is a shift differential" created a contract, binding CME to pay him shift differential from that point forward. CME argues that the 2012 policy affords department directors the discretion to decide whether they will provide shift differential for their employees and does not entitle every employee who works a qualifying shift to shift differential payments. CME also argues that, while Petrowski's statement shows acknowledgement that shift differential exists, it does not constitute a promise to plaintiff or an agreement that he would receive a shift differential. Finally, CME argues that even assuming the policy or Petrowski's statements gave rise to a binding agreement to pay plaintiff shift differential, that agreement was modified when plaintiff realized that CME would not, in reality, pay him shift differential and he continued to work for, and accept payment from, CME.

### A. CME's 2012 written policy

Illinois courts have held "that an employee handbook or other policy statement creates enforceable contractual rights if the traditional requirements for contract formation are present." *Duldulao v. Saint Mary of Nazareth Hosp. Ctr.*, 115 Ill.2d 483, 490 (1987). First, the language of the policy must contain a promise clear enough that an employee would reasonably believe that an offer has been made. *Id*. Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer. *Id*.

14

Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement. *Id*. When these conditions are met, then the employee's continued work constitutes consideration for the promises contained in the statement, and a valid contract is formed. *Id*.

At issue here is the first *Duldulao* requirement: whether CME's 2012 policy contains a promise clear enough that an employee would reasonably believe that an offer has been made. "[A]n employee handbook or similar document creates enforceable contractual rights only when specific procedures have been prescribed by positive and mandatory language." *Doe v. First Nat'l Bank of Chicago*, 865 F.2d 864, 872 (7th Cir. 1989) (finding that a memorandum stating that employees may be disciplined, but not promising that specific procedures would be used, was not a promise clear enough that an employee would reasonably believe it constituted a contract), *see also Duldulao*, 115 Ill.2d at 491 (relying on the mandatory nature of the terms "cannot occur" and "are never dismissed" to find that an employee would reasonably believe those terms were part of her contract). A policy that something "may" result is clearly discretionary, and not mandatory. *See St. Peters v. Shell Oil Co.*, 77 F.3d 184, 187 (7th Cir. 1996). Discretionary language does not create an enforceable contract under *Duldulao*. *Id*.

In relevant part, the 2012 policy states, CME employees "may be eligible to receive shift differential pay" and "[o]nly those departments with jobs requiring continual coverage, as approved by management, during qualifying shifts may institute shift differential pay for their employees." [52-1] at 1. Nowhere does the

15

policy state that CME "must pay," or that employees "shall receive," shift differential. Instead, the policy uses permissive language, indicating that such payment is discretionary. Walsh argues, relying on cases involving statutory interpretation, that the presence of the term "may" does not necessarily mean a statement is discretionary. This may be true in some instances, but in the context of this policy, when read as a whole, it is clear that CME used permissive terms to indicate that CME directors had discretion to decide whether to institute shift differential payments. Walsh also points out that the policy does not use the word "discretionary" outright. But there are other ways, including using permissive as opposed to mandatory language, to indicate the discretionary nature of a decision.

In addition, the policy outlines the necessary procedures that department supervisors must go through to institute shift differential compensation for their employees. But there is no requirement that supervisors actually award shift differential pay or otherwise ensure that their employees receive shift differential. Walsh argues that the purpose of the policy, "to provide additional compensation for employees who are required to work a second, third or non-standard shift due to a defined business need," requires CME to provide shift differential payments to any employee who works a qualifying shift. *Id*. But nothing in the purpose statement of the policy indicates that each employee who works a qualified must shift receive shift differential payments.

Walsh's comparisons to the data center engineers, who operated on a similar schedule to DCCI and received shift differential payments, fail to refute the fact

16

that employees' shift differential compensation was left to the discretion of their department managers. Walsh argues that the data center engineer director did not have to formally exercise discretion before his employees began receiving shift differential on their paychecks. Even so, nothing in the policy requires CME to treat each department the same.[5] As a result, CME is not obligated to pay plaintiff shift differential pursuant to the 2012 policy.[6]

## B.     Petrowski's oral statement

Next, Walsh argues that Petrowski's statement to him that "[t]here is a shift differential. There is a shift differential" created an enforceable contract, requiring CME to pay him shift differential for qualifying shifts.[7] As CME points out, to survive summary judgment plaintiff must show that there was "a manifestation of mutual assent on the part of two or more persons." *Hess*, 668 F.3d at 452. Plaintiff has failed to do so here. First, Petrowski's acknowledgment that a shift differential

---

[5] Walsh also argues that the 2012 Policy is not discretionary because: (1) Petrowski was not aware of CME's shift differential policy until 2016, and a person cannot exercise discretion under a policy he has no knowledge of; and (2) had Petrowski exercised his discretion under the policy, Human Resources would have been aware of that decision, and Francis would not have emailed Tolsky to ask whether Walsh should be receiving shift differential for qualifying shifts. Walsh also argues that Tolsky's and Petrowski's explanations for why DCCI employees were not receiving shift differential payments were fabricated. But neither Petrowski's knowledge of the policy, nor his statements or actions in relation to it, affects the fact that the policy is discretionary. The point is that shift differential pay was not guaranteed.

[6] Walsh compares the language of the 2012 policy with that of a 2016 policy, which explicitly states that management has the discretion to provide shift differential pay to employees. However, considering the revised policy to determine the meaning of the original would violate Rule 407 of the Federal Rules of Evidence and discourage efforts to clarify contractual obligations. *See Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1045 (7th Cir. 2007).

[7] CME also discusses the relevance of a 2010 blog post which Walsh came across, [53] at 9, but Walsh does not rely on this blog post as a basis for his claims.

17

exists does not manifest intent to pay plaintiff a shift differential. Second, Plaintiff has failed to establish his own manifestation of assent for the entire relevant time period. He has admitted, for example, that when he saw the written policy for the first time in 2013, "[he] knew [he] wouldn't" receive a shift differential on any future paychecks. Human Resources also told Walsh that he would not be receiving shift differential payments. Walsh points out that he did not continue to inquire about the shift differential policy for fear of retaliation, not because he did not believe he should be receiving those payments. But even assuming Walsh believed he should be getting shift differential payments, he has failed to demonstrate *mutual* assent, and he has not shown that Petrowski's statements entitled to him shift differential payments.

### C. Modification

Finally, even if Walsh had shown that either CME's written policy or Petrowski's statements required CME to pay him shift differential, Walsh accepted a modification to that agreement by continuing to work for CME after it had become clear that he would not, in fact, receive shift differential. Because an at-will employment contract is terminable at the will of either party, it can "be modified at any time by either party as a condition of its continuance." *Swalley v. Addressograph-Multigraph Corp.*, 158 F.2d 51, 54 (7th Cir. 1946). And "[u]nder Illinois law, '[c]ontinued performance is seen as both acceptance and consideration' for an at-will employment agreement." *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 706 (7th Cir. 2004) (quoting *Schoppert v. CCTC Int'l, Inc.*, 972 F.Supp. 444, 477

(N.D. Ill. 1997). Thus, an employer's promise to provide a benefit can be modified if the employer later rescinds that promise and the employee continues working after realizing the benefit will not be conferred. *See Kamboj v. Eli Lilly & Co.*, No. 05 C 4023, 2007 WL 178434, at *8–9 (N.D. Ill. Jan. 18, 2007) (finding that an employee who continued to work after she no longer expected to receive the salary her employer promised her upon hiring, had modified her contract to include the lower salary).

Walsh argues that there is no evidence that CME modified its 2012 policy, and that even if there were, modification is a question of fact to be determined by the fact-finder. While in some cases modification may be a question of fact inappropriate for resolution at the summary judgment stage, here the parties do not dispute the relevant material facts, and so summary judgment is appropriate. Aside from his first paycheck, Walsh never received a shift differential payment. He continued to work after his second paycheck, when the overpayment was recouped. When he sought clarification about whether he would receive shift differential on future paychecks, he was told he would not. He continued to work. Walsh admits that upon seeing the written policy in 2013, he did not expect to receive shift differential pay, and again, he kept working and accepting payment without shift differential. As a result, even if plaintiff were at some point entitled to shift differential per either the written policy or Petrowski's statements, he accepted CME's modification of any such agreement by continuing to work without receiving shift differential after his second paycheck.

There was no agreement to pay Walsh shift differential pay, and therefore, Walsh's regular pay under the applicable statutes did not include shift differential pay. In turn, defendants are not liable for any wages under the FLSA, IMWL, or IWPCA.

## IV. Conclusion

Defendants' motion for summary judgment [37] is granted. Plaintiff's motion for summary judgment [42] is denied. Enter judgment in favor of defendants and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: October 6, 2017